AMERICAN CHIROPRACTIC
ASSOCIATION, et al.,
Plaintiffs,

v.

TRIGON HEALTHCARE, INC.,
et al., Defendants.

No. 1:00CV00113.

United States District Court,
W.D. Virginia,
Abingdon Division.

April 25, 2003.

George P. McAndrews, McAndrews, Held & Malloy, Ltd., Chicago, Illinois, for Plaintiffs.

Howard Feller, McGuireWoods LLP, Richmond, Virginia, for Defendants.

## OPINION

JONES, District Judge.

American Chiropractic Association, Inc., Virginia Chiropractic Association, Inc., and certain individual doctors and patients of chiropractic medicine filed this action against health insurer Trigon Healthcare, Inc., and affiliated companies ("Trigon") claiming anticompetitive activities harmful

to chiropractic medicine. Following discovery, Trigon has moved for summary judgment. For the reasons set forth in this opinion, I find that there are no genuine issues of material fact remaining for trial and that Trigon is entitled to judgment in its favor.

## I

Chiropractic is a recognized branch of the healing arts, and chiropractic treatment is widely utilized by consumers of medical services, mainly for neuromusculoskeletal disorders such as back pain, neck pain, and headaches. Such disorders affect a large proportion of the American adult population.[1] Trigon is a health care insurer that does business as Trigon Blue Cross Blue Shield and was formerly known as Blue Cross and Blue Shield of Virginia.[2] Until 1991 Trigon was a not-for-profit entity, but thereafter became a for-profit, publically owned corporation, in the business of offering individual and group healthcare plans to its subscribers. It is currently "the largest managed healthcare company in Virginia."[3]

The core claim made in this case is that Trigon has intentionally prevented or discouraged its subscribers from utilizing chiropractic at the behest of physicians. In the plaintiffs' words, the purpose of this conspiracy was "to prevent the transfer of insurance dollars from medical doctors to chiropractors."[4] More specifically, the plaintiffs contend that Trigon's anticompetitive conduct included the issuance of a clinical practice guideline on the treatment of low back pain; the continuation of a $500 reimbursement cap on spinal manipulations; the reduction in the payment rate for services other than spinal manipulations; the "leveling" of payments for manipulations of multiple regions of the spine; suggesting to competing providers—osteopaths and physical therapists—ways to avoid payment limitations; and negotiation with medical doctors rather than chiropractors over reimbursement terms. The legal foundations for the plaintiffs' claims are the anticonspiracy provisions of the Sherman Act, 15 U.S.C.A. § 1 (West 1997) (Count I), the Virginia Civil Conspiracy Act, Va.Code Ann. §§ 18.2–499, –500 (Michie 1996) (Count V), and the common law (Count VII); the antimonopolization provision of the Sherman Act, 15 U.S.C.A. § 2 (West 1997) (Count II); tortious interference with business expectancies (Count IV); and breach of contract (Count VI).[5] The court has jurisdiction pursuant to 28 U.S.C.A. §§ 1331, 1337(a), and 1367(a) (West 1993 & Supp.2002).

Following extensive discovery, Trigon has moved for summary judgment. The issues have been briefed and argued and the motion is ripe for decision.

1. *See* U.S. Dep't of Health & Human Servs., Office of Inspector Gen., *Chiropractic Care: Controls Used By Medicare, Medicaid, and Other Payors* 1 (1998), Pls.' Ex. 6. Most chiropractic treatment consists of manual adjustments of the spine in order to correct abnormalities known as subluxations. *See* Third Am. Comp. ¶ 39–41.

2. Trigon is an independent licensee of Blue Cross and Blue Shield Association ("BCBSA"). BCBSA was initially named as a party to this action but was voluntarily dismissed as a defendant by the plaintiffs. Trigon was recently acquired by a larger healthcare company, Anthem, Inc., based in Indiana. *See* Bob Rayner, *Trigon, Anthem Deal Gets OK*, Richmond Times–Dispatch, July 24, 2002, at C1.

3. *See* Third Am. Comp. ¶ 67; Answer to Third Am. Comp. ¶ 67.

4. Pls.' Opp'n 14.

5. Counts III (RICO) and VIII (state insurance equality laws) were earlier dismissed on motion of the defendants. *See Am. Chiropractic Ass'n. v. Trigon Healthcare, Inc.*, 151 F.Supp.2d 723, 732–35 (W.D.Va.2001).

## II

Summary judgment is appropriate when there is "no genuine issue of material fact," given the parties' burdens of proof at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see* Fed.R.Civ.P. 56(c). In determining whether the moving party has shown that there is no genuine issue of material fact, a court must assess the factual evidence and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual basis." *Id.* at 327, 106 S.Ct. 2548.

■ It is equally well established that summary judgment is appropriate in cases alleging an antitrust conspiracy and indeed is required when the plaintiff fails to offer "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " '[T]he very nature of antitrust litigation encourages summary disposition of such cases when permissible.' " *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir.1991) (quoting *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 475 (7th Cir.1988)).

After careful review of the summary judgment record, I find that the intracorporate immunity doctrine bars the majority of the plaintiffs' conspiracy allegations in this case because Trigon, as a matter of law, cannot conspire with its employees and agents. For the remainder of the plaintiffs' allegations, Trigon's sworn denials of conspiracy, the affidavits, and the deposition testimony establish that Trigon acted unilaterally and that there is no basis for any inference of a conspiracy. Accordingly, summary judgment is warranted on the antitrust conspiracy claims.

### A

■ Section 1 of the Sherman Act prohibits unreasonable restraints of trade effected by "contract, combination ... or conspiracy." 15 U.S.C.A. § 1. "It is incontestable that 'concerted action' in restraint of trade lies at the heart of a Sherman Act section 1 violation." *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 280 (4th Cir.2002). "The Sherman Act distinguishes between concerted and independent action." *Advanced Health–Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 145 (4th Cir.1990). Thus, unless the plaintiffs can prove that Trigon conspired with one or more other persons, Trigon's policies and practices regarding chiropractors cannot be a violation of section 1 of the Sherman Act.

■ "The doctrine of intracorporate immunity holds that because at least two persons must be present to form a conspiracy, a corporation cannot conspire with itself." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 151 F.Supp.2d at 731. A corporation cannot conspire with its employees or agents because "[t]he officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld Corp. v. Independence*

*Tube Corp.*, 467 U.S. 752, 769, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

■ There is a limited exception to the general rule that a corporation cannot conspire with its employees or agents when these individuals have "an independent personal stake in achieving the corporation's illegal objective." *Oksanen*, 945 F.2d at 705.

The plaintiffs have identified the primary coconspirators with Trigon as the medical doctors who served on Trigon's Managed Care Advisory Panel, the medical associations with which they were affiliated, the Medical Society of Virginia, and osteopaths and physical therapists.[6] In one of their principal arguments, the plaintiffs claim that the doctors on the Managed Care Advisory Panel helped establish a clinical practice guideline on the treatment of low back pain that de-emphasized the importance of spinal manipulation.

■ Despite these allegations, the summary judgment record shows that the independent personal stake exception is inapplicable and that intracorporate immunity bars the bulk of the conspiracy claims. In the first place, the Trigon employees who are alleged to be conspir-

ators were full-time officers and employees of Trigon, did not engage in the private practice of medicine, always acted in Trigon's best interest, and did not obtain any personal benefit from Trigon's decisions regarding chiropractors.

■ Second, the plaintiffs have not presented any evidence to show that any of the Trigon panel members competed with them for the treatment of neuromusculoskeletal disorders. At most, the plaintiffs showed that some of the doctor members were designated by their professional organizations.[7] The plaintiffs' contention that other members of these entitles may compete with doctors of chiropractic is unavailing absent evidence that Trigon's agents—the members of the Managed Care Advisory Panel—derived some direct economic benefit from the alleged illegal conduct. *See Oksanen*, 945 F.2d at 705.

Finally, it is established in the record that the Managed Care Advisory Panel had no decision making authority, but acted in an advisory capacity to Trigon. As such, its members could not control Trigon's decisions. *See id.* ("'To give advice when asked by the decisionmaker is not equivalent to being the decisionmaker it-

---

6. In their Complaint, the plaintiffs contended that the coconspirators were medical doctors serving on Trigon's Provider Policy Committee and BCBSA. *See* Third Am. Comp. ¶¶ 126, 127, 133. The Provider Policy Committee (formerly named the Provider Relations Committee) was an ad hoc committee of Trigon's board of directors, while the Managed Care Advisory Panel contained other membership. Trigon objects to any consideration of allegations concerning conspirators not expressly identified in the Complaint, but the federal rules provide that the pleadings may be deemed amended to conform to the evidence. *See* Fed.R.Civ.P. 15(b). The defendants have been made aware of the actual contention of the plaintiffs through the extensive discovery in this case. Accordingly, there is no prejudice to any party in considering these additional allegations.

7. While Trigon formally appointed the members of the Managed Care Advisory Panel, there is evidence that in practice members were chosen by the Virginia chapters of the American Academy of Pediatrics, the American Academy of Family Physicians, the American College of Physicians, and the American College of Surgeons, along with the Virginia Society of Internal Medicine, the Virginia Obstetrical and Gynecological Society, the Medical Society of Virginia, the University of Virginia Medical School, Eastern Virginia Medical School, and the Medical College of Virginia. *See* Letter from J. Lawrence Colley to Craig N. Bush of 5/2/97, Pls.' Ex. 27. As its name implies, the purpose of the Managed Care Advisory Panel was to advise Trigon on clinical issues related to managed care plans. *See* Norwood Dep. ¶ 6, Defs.' Ex. 7.

self.'") (quoting *Penn. Dental Ass'n v. Medical Serv. Ass'n*, 745 F.2d 248, 259 (3d Cir.1984)).

## B

■ The plaintiffs' remaining allegations are that Trigon conspired with the BCBSA and the professional organizations that had representatives on the Managed Care Advisory Panel to restrict access to chiropractors. However, the record demonstrates that no conspiracy existed.

The Supreme Court has declared that to establish the existence of concerted action, a plaintiff must prove that two or more persons possessed "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). "[T]here must be direct or circumstantial evidence that reasonably tends to prove that [the parties] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984).

Where, as here, the allegations of an antitrust conspiracy are based on circumstantial evidence,[8] the Supreme Court has set forth the standard for what constitutes sufficient evidence of a conspiracy and has limited the range of permissible inferences that can be drawn from circumstantial evidence. "The correct standard is that there must be evidence that tends to exclude the possibility of independent action by the [defendants]." *Monsanto*, 465 U.S. at 768, 104 S.Ct. 1464. "To survive a motion for summary judgment ... a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588, 106 S.Ct. 1348.

At bottom, the plaintiffs' conspiracy argument makes no economic sense. Trigon, as a profit-seeking corporation, had no economic motive to prevent referrals to chiropractors. In fact, the uncontradicted evidence in the record is that from 1996 to 2001 the number of chiropractors in Trigon's Participating Provider ("PAR") and Preferred Provider Organization ("PPO") networks nearly doubled (from 1095 to 1934),[9] the number of Trigon insureds receiving chiropractic manipulations nearly trebled (from 26,275 to 74,477),[10] and chiropractors' share of Trigon's total payments to professional providers increased by fourteen percent.[11] Trigon's profit-maximizing interest was to allow its members to obtain needed medical care while paying medical providers the lowest possible cost. If, as the plaintiffs' believe, chiropractic treatments are cheaper and more effective than certain competing medical remedies (such as drug therapies), it was clearly economically advantageous to Trigon to encourage, rather than discourage, the uti-

---

8. In spite of the plaintiffs' argument to the contrary, there is no direct evidence in the record of a conspiracy. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999) (holding that direct evidence must be "explicit and requires no inferences to establish the proposition or conclusion being asserted."). "Only rarely will there be direct evidence of an express agreement" in conspiracy cases. *Local Union No. 189, Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 720, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965) (Goldberg, J., dissenting). All of the alleged conspirators in this case expressly deny any plans or discussions concerning the object of the alleged conspiracy.

9. *See* Bradley Aff., Defs.' Ex. 39. The number of licensed chiropractors in Virginia increased by only eighteen percent in that period. *See* Third Am. Comp. ¶ 47.

10. *See* Zeh Aff., Defs.' Ex. 1.

11. *See* Bean Aff., Defs.' Ex. 2.

lization of chiropractic. Moreover, to the extent potential subscribers desired chiropractic care, it was in Trigon's competitive interest to provide access to that treatment. The fact that Trigon did not increase the use of chiropractic treatment as much as the plaintiffs desire is not evidence of conspiracy.[12]

In addition, the specific alleged anticompetitive conduct complained of by the plaintiffs does not support the existence of an unlawful conspiracy.

For example, the plaintiffs rely heavily on Trigon's adoption of a clinical practice guideline in 1996 as proof of a conspiracy. This guideline, entitled "Managing Low Back Problems in Adults," was drafted by Trigon employees and considered (but not revised) by the Managed Care Advisory Panel. Trigon contends that its guideline, which was distributed to all of its providers including chiropractors, was merely a simplified version of a clinical guideline published by a federal agency in 1994.[13] The plaintiffs point to the opinion of their expert, Scott Haldeman, that the Trigon guideline is "inconsistent" and "in conflict" with the federal guideline, mainly because while the Trigon guideline recommends "manipulation" as a treatment option, it omits the federal definition of manipulation. The expert believes that the feder-

al definition favors the type of manipulation given by chiropractors over other providers.[14] Even assuming that this opinion is credible—and I find it very thin—it is insufficient circumstantial proof of a conspiracy. It is clear that Trigon's guideline follows the federal guideline in a highly abbreviated form. The uncontested evidence is that since Trigon's guideline was issued in 1996, no chiropractor provider ever complained to Trigon about the omission of the definition of manipulation or anything else about it. Moreover, since it was issued, use of chiropractic treatment by Trigon subscribers has substantially increased.

The plaintiffs also complain that the continuation by Trigon in its health care plans of a maximum annual payment allowance of $500 for "spinal manipulations and other manual medical interventions"[15] is evidence of a conspiracy with medical doctors and their organizations. Again, however, this fact supports the proposition that Trigon acted in its own self interest to limit its costs. The evidence shows that Trigon's payment and coverage policies were based on its understandable goal of obtaining professional services at the lowest possible cost the market would bear.

12. The plaintiffs argue that Trigon's statistics also show that the number of visits per patient and payments per patient decreased over time. See Pls.' Opp'n 46–49. However, as the defendants point out, that may be more a function of patients' decisions following initial referrals.

13. See U.S. Dep't of Health & Human Servs., Public Health Serv., Agency for Health Care Policy & Research, *Clinical Practice Guideline No. 14, Acute Low Back Problems in Adults* (1994), Pls.' Ex. 22. In addition, there is a companion "Quick Reference Guide for Clinicians" that contains the highlights of the guideline, including algorithms (step-by-step procedures) for evaluating low back pain. See Pls.' Ex. 23. Trigon's algorithms con-

tained in its guideline closely follow the federal algorithms. See Side–by–Side Comparison of AHCPR Guidelines & Trigon Guidelines, Defs.' Ex. 51.

14. See Haldeman Decl. ¶¶ 4, 5, Pls.' Ex. 24. In the federal guideline manipulation is defined as "manual therapy in which loads are applied to the spine using short or long lever methods." U.S. Dep't of Health & Human Servs., *supra* note 12, at 34. Both the Trigon and the federal guidelines recommend manipulation as a treatment option for nonspecific low back symptoms, but the Trigon guideline does not define manipulation.

15. Third Am. Comp. ¶ 119.

Trigon was not alone in its utilization of mechanisms for limiting the expense of chiropractic services. The summary judgment record shows that caps on chiropractic payments were used by ninety-four percent of selected large national private insurers,[16] and that other healthcare insurers in Virginia have practices comparable to Trigon's.[17] There is no question but that the intent of these methods was to limit the quantity of chiropractic care. But that is not proof that Trigon (or other insurers) conspired with the medical profession to this end.[18]

The plaintiffs submitted evidence that Trigon "suggested" to osteopaths and physical therapists ways to "get around" the limitations on manipulation reimbursement and that since those professions are "closely associated with" medical doctors, these efforts show evidence of the charged conspiracy.[19] Trigon denies any such suggestions; in any event, the record is clear that Trigon never changed its procedures to benefit osteopaths or physical therapists. I do not find these allegations sufficient to produce a triable issue of fact as to the existence of an anticompetitive conspiracy.

Finally, the plaintiffs contend that there is evidence that Trigon negotiated with the Medical Society of Virginia, representing medical doctors, over reimbursement terms, but did not similarly negotiate with chiropractors. However, I agree with the defendants that the evidence shows only that Trigon was willing to listen to suggestions by this physician group. Of course, there is no evidence in the record that Trigon ever discussed with the Medical Society of Virginia, or any other professional association, any policies harmful to chiropractic providers.

### C

■ The plaintiffs allege in Count II that Trigon has attempted to monopolize the market for the treatment of neuromusculoskeletal disorders in violation of section 2 of the Sherman Act. They also allege that Trigon has conspired with BCBSA and medical doctors to monopolize this market. The plaintiffs' conspiracy to monopolize claim under section 2 of the Sherman Act fails for the same reason that the plaintiffs' section 1 claim fails—there is no evidence of a conspiracy between Trigon and any other persons.

■ The attempt to monopolize claim also is defective. This claim has four essential elements: (1) a specific intent to monopolize; (2) a relevant market; (3) predatory or anticompetitive acts; and (4) a dangerous probability of success in achieving monopolization. *See Advanced Health-Care Servs., Inc.,* 910 F.2d at 147. The short answer to this claim is that Trigon and chiropractors do not compete in the same market. *See White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98, 104 (4th Cir.1987) ("One who does not compete in a product market or conspire with a competitor cannot be held liable as a monopolist in that market.").

### D

The plaintiffs' state law conspiracy claims (Count V and Count VII) fail for

---

**16.** *See* U.S. Dep't of Health & Human Servs., *supra* note 1, at 6. Other methods used to control chiropractic costs are requiring physician referrals; co-payments, coinsurance, and deductibles; and prepayment reviews. *See id.* at ii.

**17.** *See* Bowles Aff., Defs.' Ex. 31.

**18.** For the same reasons, Trigon's 1996 reduction of the reimbursement rate for non-manipulative procedures by chiropractors and its 1997 "leveling" of payments to chiropractors for manipulations of various regions of the spine, are not proof of a conspiracy.

**19.** Pls.' Opp'n 38, 41.

the same reasons as the antitrust claims. Virginia has adopted the intracorporate immunity doctrine. *See Selman v. Am. Sports Underwriters, Inc.,* 697 F.Supp. 225, 238 (W.D.Va.1988). For those alleged conspirators not subject to the doctrine of intracorporate immunity, the facts as recited in connection with the federal antitrust laws equally show that no violation of the Virginia conspiracy laws has occurred.

## III

The plaintiffs also raise other state law claims, of which the court has supplemental jurisdiction. While I might dismiss these pendant claims, considerations of economy and fairness indicate that I should adjudicate them, since they have been fully developed and presented in this case. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 357, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

[11, 12] The chiropractor plaintiffs claim that Trigon interfered by improper means with their business expectancies to treat patients covered by Trigon. The requisite elements for proof of a tortious interference are: (1) the existence of a valid business expectancy; (2) knowledge of the expectancy on the part of the interferor; (3) an intentional interference by improper methods; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Duggin v. Adams,* 234 Va. 221, 360 S.E.2d 832, 835–36 (1987). I find that there is insufficient evidence that any such valid expectancy existed or, if it did, that any improper means of interference was used by Trigon. As explained above, Trigon's efforts to limit its costs were not illegal and do not support the state law tort claim. ██ Similarly, there is no evidence that Trigon breached any contract with the

plaintiffs. The evidence does not support any claim that Trigon's reimbursement payments were unconscionable. *See Reibold v. Simon Aerials, Inc.,* 859 F.Supp. 193, 198 (E.D.Va.1994) ("Courts will rarely find unconscionable contracts arising in a commercial context."). As noted earlier, Trigon's limitations on treatment by chiropractors are not unusual in the healthcare field. *See Stedor Enters., Ltd. v. Armtex, Inc.,* 947 F.2d 727, 733 (4th Cir.1991) (holding that where disputed provision of commercial contract was common to industry, a finding of unconscionability cannot be based on disparate size of parties). Moreover, there is no evidence that the chiropractors were under legal duress when they accepted the terms of their provider agreements. *See Blevins v. New Holland N. Am., Inc.,* 97 F.Supp.2d 747, 751 (W.D.Va.2000) (holding that lack of opportunity to negotiate a provision of a commercial contract is not sufficient evidence of unconscionability).

For these reasons, the plaintiffs are unable to prove that the provider agreements with chiropractors breached any duty to avoid unconscionable terms.[20]

## IV

For the foregoing reasons, I will grant the defendants' Motion for Summary Judgment and enter final judgment on their behalf. A separate judgment consistent with this opinion is being entered herewith.

---

20. In view of my finding that there is inadequate evidence on the merits as to the state law claims, it is not necessary that I resolve the defenses that these claims are barred by the applicable statutes of limitations or preempted by ERISA.