PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

AMERICAN CHIROPRACTIC
ASSOCIATION, INCORPORATED, a non-
profit corporation; VIRGINIA
CHIROPRACTIC ASSOCIATION,
INCORPORATED; GEORGE W.
CHIRIKINIAN, D.C.; DOUGLAS M. COX,
D.C.; WILLIAM R. THEISIER, D.C.;
JOHN C. WILLIS, D.C.; JERRY R.
WILLIS, D.C.; SARAH ELIZABETH
ALLEN; LANA KAY BALL; MARGARET
BYRNE; ROGER DALTON; MARY SUE
DEAN; HARVIE LEE FRENCH, JR.;
PATRICIA HERMAN; CINDY
LINKENHOKER; SANDRA PHILLIPPI;           No. 03-1675
DARLENE REQUIZO; DAVID RUSSOTTO;
GLORIA JEAN SMITH; LYNN D.
WAGNER; ANDREA WALLACE;
PATRICIA WHITTINGTON; BENIS D.
WOOD; RICHARD D. WORLEY; DALE
DUKE YONTZ; DOUGLAS F. AMBROSE;
GEORGE C. MCCLELLAND; JAMES M.
PORTER; LARRY L. STINE; WENDY
HOLDEN WILLIS; STEVEN W. YATES;
KEVIN J. WESTBY; GREGORY WALTER;
JEFFERSON K. TEASS,
                    *Plaintiffs-Appellants,*

                    v.

TRIGON HEALTHCARE, INCORPORATED;
TRIGON INSURANCE COMPANY; TRIGON
ADMINISTRATORS; MID-SOUTH
INSURANCE COMPANY; TRIGON
HEALTH AND LIFE INSURANCE
COMPANY,

*Defendants-Appellees,*

and

BLUE CROSS AND BLUE SHIELD
ASSOCIATION,

*Defendant.*

Appeal from the United States District Court
for the Western District of Virginia, at Abingdon.
James P. Jones, District Judge.
(CA-00-113-1)

Argued: February 24, 2004

Decided: May 6, 2004

Before WILLIAMS and MICHAEL, Circuit Judges, and
William D. QUARLES, Jr., United States District Judge
for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Michael and Judge Quarles joined.

## COUNSEL

**ARGUED:** George P. McAndrews, MCANDREWS, HELD & MAL-
LOY, LTD., Chicago, Illinois, for Appellants. Howard Feller, Bryan
Alan Fratkin, MCGUIREWOODS, L.L.P., Richmond, Virginia, for

Appellees. **ON BRIEF:** Steven J. Hampton, Patrick J. Arnold, Jr., Peter J. McAndrews, Ronald A. Dicerbo, MCANDREWS, HELD & MALLOY, LTD., Chicago, Illinois; William G. Shields, THORSEN & SCHER, Richmond, Virginia, for Appellants.

## OPINION

WILLIAMS, Circuit Judge:

In this appeal, we consider whether Trigon Healthcare, Virginia's largest for-profit health insurance company, and its affiliated companies (collectively, Trigon),[1] were engaged in an anticompetitive conspiracy with medical doctors and medical associations whose purpose was to harm chiropractors. American Chiropractic[2] filed this eight count complaint alleging violations of federal antitrust laws, the Racketeer Influenced and Corrupt Organizations Act (RICO), and various state laws, claiming that Trigon and the medical doctors and associations were engaged in a conspiracy that used Trigon's reimbursement policies and treatment guidelines to limit severely the flow of insurance dollars to chiropractors and steer those monies toward medical doctors. Trigon argues that no conspiracy exists, and that it implemented its coverage policies unilaterally based on market supply and demand. The district court agreed with Trigon, dismissing two counts of the complaint for failure to state a claim and disposing of the remaining counts by granting Trigon's motion for summary judgment. Although we apply different reasoning than the district court in some areas, we affirm its disposition of the case in favor of Trigon.

---

[1]Trigon Healthcare was recently purchased by Anthem Healthcare, an Indiana based health insurance company. To be consistent with the district court's usage and the factual record developed below, we refer to the corporation as "Trigon."

[2]We refer to the appellants, the American Chiropractic Association, the Virginia Chiropractic Association, certain individual chiropractors and some patients of individual chiropractors, collectively as "American Chiropractic."

I.

Trigon is a for-profit, publicly-traded health insurance company located in Virginia. Trigon's business consists of selling individual and group healthcare benefit plans to its subscribers. Generally, these healthcare benefit plans list the benefits and services covered by Trigon under the plan and describe any services that are excluded from the plan or are the subject of coverage limitations. Trigon makes a network of healthcare providers, including medical doctors, hospitals, pharmacies, chiropractors, and therapists, available to plan members to provide the services covered under the plan. Trigon creates this network of healthcare providers by entering into contracts with providers who are willing to abide by Trigon's terms and conditions, as set forth in Trigon's provider agreements. Simply put, "Trigon is essentially purchasing services from the healthcare providers who agree to become participating providers in Trigon's [provider] networks." (J.A. at 1344.) Trigon strives to offer "the best coverage at the lowest possible cost," and it endeavors to pay "the lowest possible price" to healthcare providers to ensure low-cost access for plan enrollees. (J.A. at 1597, 4579.)

Chiropractic medicine is "a non-pharmaceutical, nonsurgical system of health care based on the self-healing capacity of the body" with the aim of "removing irritants to the nervous system and restoring proper function" to the nervous system. *Dorland's Medical Illustrated Dictionary* 347 (30th ed. 2003). Chiropractic treatment most commonly involves spinal manipulations[3] to relieve musculoskeletal complaints. *Id.* Trigon has provided coverage for chiropractic services since the 1980's, and Trigon "acknowledge[s] that chiropractic care has a health effect, a positive health effect when rendered appropriately."[4] (J.A. at 4186.)

---

[3]Spinal manipulation is defined by the Agency for Health Care Policy and Research, a division of the U.S. Department of Health and Human Services, as "manual therapy in which loads are applied to the spine using short or long lever methods." (J.A. at 5507.)

[4]The use of chiropractors by Trigon's plan enrollees has increased substantially since Trigon began covering chiropractic care. For instance, in 1996 only 26,275 plan enrollees received spinal manipulation treatment

Despite Trigon's coverage of chiropractic services, and the fact that chiropractic medicine is, as the district court noted, a "recognized branch of the healing arts," *see American Chiropractic Association v. Trigon Healthcare, Inc.*, 258 F. Supp. 2d 461, 463 (W.D. Va. 2003), there is a history of animus from medical doctors and insurers aimed at chiropractors. Beginning in 1962, the American Medical Association (AMA), aided by the National Association of Blue Shield Plans,[5] began a "lengthy, systematic, successful, and unlawful" national group boycott aimed at destroying chiropractic medicine. *Wilk v. Am. Medical Ass'n.*, 895 F.2d 352, 371 (7th Cir. 1990). As the Seventh Circuit explained:

> In 1963 the AMA formed its Committee on Quackery ("Committee"). The Committee worked diligently to eliminate chiropractic. A primary method to achieve this goal was to make it unethical for medical physicians to professionally associate with chiropractors. Under former Principle 3, it was unethical for medical physicians to associate with "unscientific practitioners." In 1966, the AMA's House of Delegates passed a resolution labelling chiropractic an unscientific cult.

*Id.* at 356.

Beginning in 1977, the AMA slowly began to phase out its boycott of chiropractors, and the Seventh Circuit adopted the *Wilk* district court's finding that the boycott became dormant in 1980 when Principle 3 was revised.[6] *Id.* at 356, 374. Although Trigon is a licensee of

---

from chiropractors, but that number jumped to 74,477 by 2001. The number of chiropractic providers in Trigon's network rose from 513 to 961 during the same time span, and now almost 90% of chiropractors in the Commonwealth of Virginia are in Trigon's provider network. In addition, the total amount of payments from Trigon to chiropractors rose from $12,380,737 in 1996 to $21,510,503 in 2001.

[5]This organization is now called Blue Cross & Blue Shield Association of America.

[6]Although the Seventh Circuit recognized that the boycott ended in 1980, it affirmed a grant of injunctive relief against the American Medical Association because some of its actions in 1983 "indicated the AMA's likelihood of returning to its old (anti-chiropractic) ways." *Wilk v. Am. Medical Ass'n.*, 895 F.2d 352, 367 (7th Cir. 1990).

Blue Cross & Blue Shield Association of America, there is no record evidence connecting Trigon to this boycott.

American Chiropractic, however, asserts that medical doctors continue to harbor animosity toward chiropractors and have entered into an anticompetitive conspiracy with Trigon to harm chiropractors. American Chiropractic contends that medical doctors and their medical associations have conspired with Trigon to limit the usage of chiropractors by Trigon's plan enrollees and to restrain severely the reimbursement paid to chiropractors for services rendered to plan enrollees. The ultimate goal of this conspiracy, American Chiropractic argues, is to shift insurance dollars away from chiropractors toward medical doctors and harm the business of chiropractors.

In response to this perceived anticompetitive conspiracy, American Chiropractic brought this action in the United States District Court for the Western District of Virginia on August 18, 2000. American Chiropractic's eight-count complaint alleged that Trigon[7] conspired with medical doctors and medical associations to restrain interstate trade in violation of § 1 of the Sherman Antitrust Act, 15 U.S.C.A. § 1 (West 1997) (count one); attempted to monopolize the market for treatment of neuromusculoskeletal conditions in violation of § 2 of the Sherman Act, 15 U.S.C.A. § 2 (West 1997) (count two); engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1962 (West 2000) (count three); tortiously interfered with the business enterprise of chiropractors in violations of state common law (count four); conspired to injure chiropractors in their trade or practice in violation of Va. Code Ann. § 18.2-499 (Michie 1996) (count five); committed state common law breach of contract (count six) and conspiracy (count seven); and violated Va. Code Ann. §§ 38.2-2203, 38.2-3408, 38.2-4221, and 38.2-4312(E) (Michie 2002), referred to as the Virginia insurance equality laws (count eight). The district court exercised supplemental jurisdiction over the state law claims pursuant to 28 U.S.C.A. § 1367 (West 1993).

---

[7]The complaint initially named Blue Cross & Blue Shield of America in addition to Trigon Healthcare, Inc. and its affiliated companies. Blue Cross & Blue Shield of America was voluntarily dismissed as a defendant by American Chiropractic.

Trigon moved to dismiss the complaint in its entirety on October 13, 2000. The district court, on July 19, 2001, granted that motion in part and dismissed American Chiropractic's RICO (count three) and Virginia insurance equality (count eight) claims for failure to state claims. The district court held that the RICO claim was preempted by the McCarran-Ferguson Act and that the Virginia insurance equality laws relied upon by American Chiropractic did not create private causes of action.

Following discovery, on August 13, 2002, Trigon filed a motion for summary judgment on the remaining counts in the complaint. American Chiropractic did not file a Rule 56(f) motion requesting further discovery, but it did contest Trigon's motion for summary judgment. After the benefit of oral argument, the district court, on April 25, 2003, granted Trigon's motion for summary judgment on the remaining counts. As to counts one, five, and seven, the district court found that the intracorporate immunity doctrine precluded any conspiracy between Trigon and the medical doctors that served on one of its committees, the Managed Care Advisory Panel, and that American Chiropractic had produced no other evidence of a conspiracy between Trigon and the medical doctors or medical associations. As to American Chiropractic's claim for monopolization (count two), the district court granted summary judgment because Trigon did not possess monopoly power in the relevant market. It also granted Trigon's motion for summary judgment as to American Chiropractic's state law claims for tortious interference (count four) and breach of contract (count six). American Chiropractic noted a timely appeal of the district court's rulings, and we have jurisdiction under 28 U.S.C.A. § 1291.

On appeal, American Chiropractic argues: (1) that the district court erred in holding the intracorporate immunity doctrine applies to this case; (2) that the district court erred in holding that there was insufficient evidence of a conspiracy between Trigon and the medical associations to withstand summary judgment; (3) that the district court erred in granting summary judgment on the tortious interference claim; (4) that the district court erred in dismissing the Virginia insurance equality claim; (5) that the district court erred in dismissing the RICO claim as preempted by the McCarran-Ferguson Act; and (6)

that the district court abused its discretion in conducting discovery.[8] We address each contention in turn.

## II.

## Counts One, Five, and Seven

## (The Conspiracy Counts)

American Chiropractic first contends that the district court erred in finding that the intracorporate immunity doctrine barred the possibility of a conspiracy between Trigon and its Managed Care Advisory Panel (MCAP) and in granting summary judgment on American Chiropractic's claim under §1 of the Sherman Act and its state law conspiracy claims.[9] We review the grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. *See Figgie Int'l, Inc. v. Destileria Serralles, Inc.*, 190 F.3d 252, 255 (4th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Under its Section 1 claim, American Chiropractic alleged that Trigon and its MCAP, a committee established by Trigon, created false referral guidelines meant to limit the usage of chiropractors for the treatment of lower back pain and, accordingly, to keep insurance reimbursement monies away from chiropractors. Trigon established the MCAP, composed of six Trigon employees and nine independent

---

[8]We note that American Chiropractic does not appeal the district court's grant of summary judgment on its § 2 Sherman Act claim (count two) or the state law breach of contract claim (count six).

[9]Because the state law conspiracy claims follow the same analysis as the § 1 claim, we do not address them separately. *See Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 284 (4th Cir. 2002) (noting that the Virginia Civil Conspiracy Act does not create liability absent a violation of the federal antitrust laws); *Fox v. Deese*, 362 S.E.2d 699, 708 (Va. 1987) (adopting intracorporate immunity doctrine for Virginia conspiracy laws).

medical doctors appointed by professional organizations,[10] to "obtain input and advice from medical doctors on clinical issues such as quality control initiatives." (J.A. at 1348.) The MCAP "was formed and appointed by officers and employees of Trigon." (J.A. at 1352.) Dr. Lawrence Colley, Trigon's Vice President for Corporate Medical Policy during the relevant time period, also served as a member of the MCAP. It is undisputed that the MCAP was never given information regarding specific payment policies and that it lacked any decision-making authority.

American Chiropractic points to the MCAP's approval, in October 1995, of Trigon's practice guideline, titled "Managing Low Back Problems in Adults" (the Low Back Guideline), as evidence of an anticompetitive conspiracy between the members of the MCAP and Trigon. (J.A. at 6119.) This Low Back Guideline was drafted as an informative practice guideline for physicians. The Guideline also did not bear any relation to Trigon's coverage and reimbursement policies. (J.A. at 1539-40.) The Low Back Guideline was written by Trigon's employees, not the MCAP, and was issued in response to a lengthy study by the Agency for Health Care Policy and Research (AHCPR), a division of the U.S. Department of Health and Human Services.

The AHCPR study was titled "Acute Low Back Problems in Adults" and was accompanied by a reference guide for treating low back pain. The study recommended spinal manipulation "in place of medication or a shorter trial [of manipulation] if combined with NSAIDS"[11] for the treatment of low back pain. (J.A. at 5653.) The AHCPR study defined "manipulation" as "manual therapy in which loads are applied to the spine using short or long lever methods." (J.A. at 5507.) This definition of manipulation referred to the procedure rendered primarily by chiropractors, as opposed to medical doctors. One medical journal, the *Annals of Internal Medicine*, stated in July

---

[10]These organizations include the Virginia Society of Internal Medicine, the Medical Society of Virginia, the American College of Physicians, the University of Virginia School of Medicine, the Eastern Virginia Medical School and other medical organizations.

[11]NSAIDs is an abbreviation for non-steroidal anti-inflammatory drugs such as aspirin and ibuprofen.

1998 that "the [AHCPR] recently made history when it concluded that spinal manipulative treatment is the most effective and cost-effective treatment for acute low back pain." (J.A. at 4984.) American Chiropractic argues that this AHCPR study "was a boon to chiropractors and a setback for medical doctors." (Appellant's Br. at 22.)

Trigon intended its under ten page Low Back Guideline to be "a shortened and user-friendly format" of the over one-hundred and fifty page AHCPR study for health care providers. (J.A. at 1538.) The Low Back Guideline stated that it was "adapted from the [AHCPR] and . . . approved and endorsed by Trigon's Managed Care Advisory Panel." (J.A. at 6123.) The MCAP considered the Low Back Guideline, alongside two other practice guidelines, on October 25, 1995. During that meeting, one of the medical doctors on the MCAP asked if the guidelines the MCAP was considering were meant to be referral guidelines. Dr. Colley told them that the guidelines were referral guidelines.[12] The MCAP then adopted and approved the Low Back Guideline without making or suggesting any changes to it.

American Chiropractic argues that the Low Back Guidelines are false and misleading in two principal ways. First, the Low Back Guideline provided that "[a] short trial of manipulation may be as effective as NSAIDs." (J.A. at 6120.) American Chiropractic contends that the AHCPR guideline stands for the proposition that manipulation is *more effective* than NSAIDs. Second, the Low Back Guideline did not define the term "manipulation." According to American Chiropractic, the absence of this definition meant that the Low Back Guideline deterred primary care physicians from referring patients to chiropractors because it failed to identify manipulation practiced by chiropractors as the specific type of manipulation recommended. Dr. Scott Haldeman, one of American Chiropractic's experts and a member of the AHCPR panel, opined that "[b]y omitting the AHCPR's definition of manipulation, Trigon and its Managed Care

---

[12]It is unclear whether Dr. Colley was stating that the Low Back Guideline was a referral guideline, or if he was referencing one of the other guidelines before the Managed Care Advisory Panel. Because this fact does not affect our analysis on American Chiropractic's Section 1 claim, we will assume that Dr. Colley was referencing the Low Back Guideline.

Advisory Panel materially altered the recommendations of the AHCPR." (J.A. at 5672.) Because of this omission, according to Dr. Haldeman, Trigon's guidelines would "deprive patients of the benefit from spinal manipulation as practiced by doctors of chiropractic, and . . . deprive doctors of chiropractic of the opportunity to treat those patients." (J.A. at 5672.)

The district court was not persuaded by American Chiropractic's argument, and held that, under the intracorporate immunity doctrine, Trigon was legally incapable of conspiring with the MCAP. Additionally, the district court then found that American Chiropractic had failed to adduce sufficient evidence of a conspiracy between Trigon and the medical associations who appointed individuals to the MCAP to survive summary judgment. On appeal, American Chiropractic argues that the intracorporate immunity doctrine does not apply, either because the medical doctors on the MCAP lacked a unity of interest with Trigon or because the independent personal stake exception to the doctrine should apply. American Chiropractic also contends that it has produced direct evidence of a conspiracy among Trigon and the medical doctors on the MCAP and the medical associations that appointed those doctors.

## A.

We consider first American Chiropractic's argument that Trigon conspired with the medical doctors who served on the MCAP.[13] Section 1 of the Sherman Act provides, in relevant part, that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C.A. § 1. Thus, to establish a § 1 violation, a plaintiff must show: "(1) a contract, combination or conspiracy; (2) that imposed an unreasonable restraint of trade." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002). "It is incontestable that 'concerted action' in restraint of trade lies at the heart of a Sherman Act section 1 violation." *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.*, 307 F.3d 277, 280 (4th Cir. 2002). In other words, § 1 "does not reach conduct that is wholly unilateral."

---

[13]American Chiropractic did not argue that Trigon conspired with its own employees serving on the MCAP.

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (internal quotation marks omitted).

"Proof of concerted action requires evidence of a relationship between at least two legally distinct persons or entities." *Oksanen v. Page Memorial Hosp.*, 945 F.2d 696, 702 (4th Cir. 1991) (en banc). Thus,

> it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Copperweld*, 467 U.S. at 769. Moreover, "§ 1 is not violated by the internally coordinated conduct of a corporation and one of its unincorporated divisions." *Id.* at 770. "For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." *Id.* at 771. Accordingly, the Supreme Court has held that a parent and its wholly owned subsidiary are legally "incapable of conspiring with each other for purposes of § 1 of the Sherman Act." *Id.* at 777. The Court in *Copperweld* noted further that "a parent and a wholly owned subsidiary *always* have a 'unity of purpose or a common design'" so the law's concern with a sudden joining of independent interests is not present in such a case. *Id.* at 771 (emphasis added).

We have applied this "intracorporate immunity" doctrine articulated in *Copperweld* to hold that a hospital lacked the capacity to conspire with its peer review committee for purposes of § 1. *See Oksanen*, 945 F.2d at 706.[14] The plaintiff in *Oksanen*, a doctor, contended that the hospital conspired with its peer review committee,

---

[14]A lawsuit alleging a conspiracy between a hospital and its peer review committee currently would be barred under the Health Care Quality Improvement Act of 1986. 42 U.S.C.A. §§ 11101-11152 (West 1995 & Supp. 2003). That Act was passed after the filing of Oksanen's lawsuit and was not made retroactive to pending cases.

composed of staff physicians at the hospital, to limit and then revoke his staff privileges. Although the hospital and its medical staff were "legally separate entities," we held that the intracorporate immunity doctrine applied, explaining that "we must examine the substance, rather than the form, of the relationship between the hospital and the medical staff during the peer review process." *Id.* at 703. We concluded that the hospital and the doctors on the peer review committee possessed a unity of interest: improving the quality of patient care. "Like a corporation delegating authority to its officers, the [hospital] delegated peer review decisionmaking in the first instance to the medical staff." *Id.* at 703. Thus, "[i]n effect, the medical staff was working as the [hospital's] agent." *Id.*; *see also Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) ("The intracorporate immunity doctrine provides that a conspiracy can not exist between the agents of a corporation and the corporation itself."); *ePlus Technology v. Aboud*, 313 F.3d 166, 179 (4th Cir. 2002) ("[A]cts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation."). Moreover, the hospital "retained ultimate responsibility for all of the hospital's credentialing decisions." *Oksanen*, 945 F.2d at 704. The hospital's "ultimate control over peer review decisions enable[d] it to employ peer review to pursue its interests." *Id.* Finally, we questioned whether hospitals possessed any economic motive for conspiring with some medical doctors to exclude others from the staff: "[i]f a physician is qualified and does not disrupt the hospital's operations, it is in the hospital's interest to include, not exclude, that physician." *Id.*; *see also* P. Areeda and H. Hovenkamp, *Antitrust Law* ¶ 1471b (1999 Supp.).

We have continued to recognize the existence of one narrow exception to the intracorporate immunity doctrine — the independent personal stake exception. In *Greenville Pub. Co. v. Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir. 1974), we held that an exception to the intracorporate immunity doctrine "may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective." *Id.* at 399. We declined an invitation to apply the exception in *Oksanen* because the peer review committee lacked the ability to bind the hospital. "If the officer cannot cause a restraint to be imposed and his firm would have taken the action anyway, then any independent interest is largely irrelevant to antitrust analysis." *Oksanen*, 945 F.2d at 705. Put differently, "[t]o give advice when

asked by the decisionmaker is not equivalent to being the decision-maker itself." *Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n.*, 745 F.2d 248, 259 (3d Cir. 1984).

Applying this reasoning here, we agree with the district court that, under the intracorporate immunity doctrine, Trigon lacked the legal capacity to conspire with the medical doctors on the MCAP. American Chiropractic argues that because the medical doctors on the MCAP do not share a unity of interest with Trigon, the MCAP cannot be considered a corporate agent of Trigon. A similar argument was raised and rejected in *Oksanen*. There, the plaintiff had alleged that the medical doctors on the peer review committee did not have a unity of interest with the hospital because the medical doctors would act in their own best interest, not the best interest of the hospital. As mentioned above, we found that the medical doctors, in their role as members of the peer review committee, had a unity of interest with the hospital: ensuring patient care. We believe that *Oksanen*'s reasoning is not only instructive but persuasive here.

American Chiropractic is undoubtedly correct that medical doctors and insurance companies do not, generally speaking, share a unity of interest. That, however, is not the correct inquiry in cases applying the intracorporate immunity doctrine. Instead, we look to whether the medical doctors, in their role as members of the MCAP, share a unity of interest with Trigon that makes them corporate agents of Trigon. We believe that they do.

Because Trigon established the MCAP to offer input on clinical issues faced by Trigon, the individual medical doctors, in their role as members of the MCAP, shared the same interest as Trigon: addressing clinical issues in a manner that would best serve its consumers, the plan enrollees. The MCAP is without question a corporate agent of Trigon, chaired by a Trigon employee, and we believe that the intracorporate immunity doctrine applies to its actions. The decision to consult with doctors on the MCAP does not "represent the sudden joining of economic forces that section one is designed to deter and penalize." *Oksanen*, 945 F.2d at 703. By creating the MCAP, Trigon did not bring together independent economic forces. Instead, Trigon had "ultimate control" over the MCAP's actions and was able to employ the MCAP to pursue its interests. In fact, we are

presented with even stronger reasons for applying the doctrine here than we were in *Oksanen* because, in *Oksanen*, the peer review committee and the hospital were legally distinct entities. The MCAP is not legally distinct from Trigon.

American Chiropractic's argument paints with too broad a brush, and would, in effect, undercut much of the rationale of the intracorporate immunity doctrine by focusing on form over substance. Penalizing "coordinated conduct simply because a corporation delegated certain responsibilities to autonomous units might well discourage corporations from creating divisions with their presumed benefits." *Copperweld*, 467 U.S. at 771. "Far from being a competitor with [Trigon], the [MCAP] was in fact a natural component of [Trigon's] management structure. " *Oksanen*, 945 F.2d at 703.

Moreover, the independent personal stake exception does not apply because the MCAP did not have the power to bind Trigon; it only made non-binding recommendations and endorsed materials already composed by Trigon employees. In fact, the MCAP did not even recommend changes to the Low Back Guideline. While the MCAP's seal of approval was important to Trigon from a business perspective because it allowed Trigon to market various publications as approved by a panel of medical doctors, American Chiropractic has made no showing that the MCAP itself could rewrite any part of such a publication and make Trigon issue those rewritten publications. The ultimate decision as to the contents of any document before the MCAP always rested with Trigon, and, accordingly, the independent personal stake exception cannot apply. *See id.* at 705.

Thus, we agree with the district court that Trigon lacked the capacity to conspire, within the meaning of § 1, with its corporate agent, the MCAP or its members.

## B.

American Chiropractic next argues, assuming that the MCAP did not conspire with Trigon, that the medical associations who placed their members on the MCAP conspired with Trigon to publish the allegedly misleading guidelines and to implement several coverage policies aimed at limiting the usage and reimbursement of chiroprac-

tic services. As discussed above, to establish a § 1 violation, a plaintiff must show: "(1) a contract, combination, or conspiracy, (2) that imposed an unreasonable restraint of trade." *Dickson*, 309 F.3d at 202. A plaintiff can offer direct or circumstantial evidence to prove concerted action. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 774 (1984). American Chiropractic argues on appeal that it provided direct evidence of this conspiracy, in the form of the minutes from the MCAP meeting where the MCAP approved the Low Back Guideline, and the Low Back Guideline itself. These minutes and the Low Back Guideline, American Chiropractic alleges, represent direct evidence of a conspiracy orchestrated between the medical associations and Trigon. Additionally, American Chiropractic argues that it presented direct evidence that Trigon and the medical associations conspired to implement two other coverage policies with the intent to harm chiropractors — a $500 cap on spinal manipulations and a reduced reimbursement rate for chiropractors and other limited license providers.

In 1988, Trigon instituted a $500 yearly reimbursement cap on spinal manipulations, regardless of "what type of provider renders the services." (J.A. at 5345.) Although this $500 reimbursement cap is facially neutral, in that it does not target a specific provider, neither side disputes that chiropractors are the main providers of spinal manipulations. One chiropractor testified that no other insurance company had a cap as harsh as Trigon's, and that a "majority" of insurance companies did not use a hard coverage cap on spinal manipulations. (J.A. at 7900, 7903-04.) This $500 annual coverage limit on spinal manipulations has remained in place since 1988.

In 1996, Trigon lowered the reimbursement rate for limited-license practitioners,[15] including chiropractors, to 60% (from 70%) of that received by fully-licensed practitioners performing the same procedure. As explained by Trigon, "the marketplace for third party health-care coverage is extremely competitive and our customers are extremely price sensitive," making the lower reimbursement rate "appropriate and reasonable." (J.A. at 4636, 6337.)

---

[15]Limited-license providers are defined by Trigon to include chiropractors, speech therapists, occupational therapists and physical therapists.

American Chiropractic argues that both of these policies resulted from a conspiracy between Trigon and the medical associations. The $500 annual cap, American Chiropractic asserts, was implemented with the purpose of limiting the utilization of chiropractic services, while the lower reimbursement rate was intended to shift insurance dollars from chiropractors to medical doctors. American Chiropractic argues that, because Trigon recognizes that chiropractic care is effective and inexpensive, policies like these that have an adverse effect on chiropractic care are direct evidence that Trigon is not making an independent economic judgment but rather conspiring to harm chiropractors.

"[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Direct evidence is extremely rare in antitrust cases and is usually referred to as the "smoking gun." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003). We agree with the Third Circuit that direct evidence in this context is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Id.* (quotation marks omitted); *see United Mine Workers of Am. v. Pennington*, 381 U.S. 676, 720 (1965) (Goldberg, J., dissenting) ("Only rarely will there be direct evidence of an express agreement" in conspiracy cases). American Chiropractic's offering falls far short of this standard. At most, the MCAP meeting shows contact between two independent economic actors, but "mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an anticompetitive conspiracy." *Cooper v. Forsyth County Hosp. Auth.*, 789 F.2d 278, 281 (4th Cir. 1986). The two coverage policies are also not direct evidence of a conspiracy because both require the rather large inferential leap that Trigon drafted and implemented the policies only after reaching an agreement with medical doctors and associations.

Furthermore, as the district court explained,[16] American Chiroprac-

---

[16]American Chiropractic also limited its arguments to direct evidence of a conspiracy before the district court, but that court found that American Chiropractic offered no direct evidence of a conspiracy and instead analyzed whether there was circumstantial evidence of a conspiracy.

tic has not entered sufficient indirect evidence of a conspiracy to harm chiropractors. It is undisputed that use of chiropractic treatment by Trigon subscribers has substantially increased since the Low Back Guideline was issued in 1996. *See supra* note 4. Since 1996, the amount of money paid to chiropractors by Trigon has also risen substantially, from approximately $12 million dollars to over $21 million in 2001. The reimbursement policies about which American Chiropractic complains are facially neutral policies that admittedly have an effect on chiropractors. There is, however, no evidence of an effort by Trigon to harm chiropractors apart from these facially neutral reimbursement policies and the Low Back Guideline, and, more importantly, American Chiropractic has failed to show that either the reimbursement policies or the Low Back Guideline was the result of an antitrust *conspiracy*. They have pointed to no evidence that Trigon conspired with any entity in forming its policies. In fact, the only evidence in the record is that all of the actions in dispute were taken unilaterally by Trigon employees. In the face of Trigon's affidavits that it acted unilaterally, American Chiropractic needed more to create a genuine issue of material fact.

Moreover, American Chiropractic has not explained why Trigon would, as an economic matter, attempt to exclude chiropractors from its provider network or dissuade patients from the use of chiropractic services if chiropractic care is more cost-effective than other medical care. As the district court ably explained, *see Trigon Healthcare*, 258 F. Supp. 2d at 466-67, this alleged conspiracy does not make economic sense from Trigon's perspective. We agree with the district court that, "as a profit-seeking corporation, [Trigon] had no economic motive to prevent referrals to chiropractors." *Id.* at 466.

Accordingly, we affirm the district court's grant of summary judgment on American Chiropractic's claim under § 1 of the Sherman Act (count one) and its state law conspiracy claims (counts five and seven).[17]

---

[17]Because we find that American Chiropractic failed to prove the existence of an anticompetitive conspiracy, we do not consider whether American Chiropractic entered sufficient evidence that Trigon and the medical associations and medical doctors implemented unreasonable restraints on trade.

III.

Count Four

(Tortious Interference)

American Chiropractic next challenges the grant of summary judgment in favor of Trigon on its state law claim for tortious interference. We review the grant of summary judgment de novo. *Figgie Int'l*, 190 F.3d at 255. Virginia law permits recovery for such claims where a party can show "(1) the existence of a business relationship or expectancy, with a probability of future economic benefit to plaintiff; (2) the defendant's knowledge of the relationship or expectancy; (3) a reasonable certainty that absent defendant's intentional misconduct, plaintiff would have continued in the relationship or realized the expectancy; and (4) damages to plaintiff." *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 896 (Va. 1997) (quotation marks omitted). "[P]roof of the existence of the first and third elements of the tort must meet an objective test," and "mere proof of a plaintiff's belief and hope that a business relationship will continue is inadequate to sustain the cause of action." *Id.* at 897. Instead, a plaintiff must "establish a *probability* of future economic benefit, not a mere possibility." *Id.* (emphasis added). When a plaintiff is alleging that a third party has interfered with a business expectancy rather than with an actual contract, the plaintiff must "show that the defendant interfered by employing improper methods." *Peterson v. Cooley*, 142 F.3d 181, 186 (4th Cir. 1998). Improper methods are "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987).

Under this count, American Chiropractic argues that the $500 annual coverage cap on spinal manipulations tortiously interfered with the chiropractors' business expectancy that their patients would continue to seek treatment from them. This argument fails because American Chiropractic has not shown a business expectancy with a probability of future economic benefit. Virginia law requires objective proof of a probability of future economic benefit, not just a hope or a belief that a business relationship will continue. American Chiropractic admitted that patients have the ability and the right to termi-

nate their relationship at any time, and it has not introduced any evidence showing more than a hope or belief that, generally speaking, patients would continue seeking treatment from chiropractors. The chiropractors never had written contracts with their patients, and some patients unilaterally terminated their treatment relationships with the chiropractors. Because American Chiropractic failed to show that it has an objective, valid business expectancy with a probability of future economic benefit, the district court was correct to grant summary judgment to Trigon on this count.[18]

IV.

Count Eight

(Virginia Insurance Equality Statutes)

American Chiropractic also argues that the district court erred in dismissing its claim under the Virginia insurance equality laws for failure to state a claim. We review the dismissal of a complaint under Federal Rule of Civil Procedure 12(b)(6) de novo. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). On appeal from an order granting a Rule 12(b)(6) motion to dismiss, this court accepts as true the facts as alleged in the complaint, views them in the light most favorable to the plaintiff, and recognizes that dismissal is inappropriate "unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim." *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 n.4 (4th Cir. 1993); *see Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (explaining that dismissal for failure to state a claim is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations").

In its complaint, American Chiropractic alleged that Trigon violated Virginia's insurance equality laws, found in Va. Code Ann. §§ 38.2-2203, 38.2-3408, 38.2-4221, and 38.2-4312(E), because Tri-

---

[18]Because we conclude that American Chiropractic lacked a valid business expectancy, we do not address the district court's alternative ground for granting summary on this claim — that Trigon did not use improper means in interfering with the chiropractors' alleged business expectancy.

gon implemented reimbursement and utilization restrictions targeted only at chiropractors, not medical doctors. The district court found that none of these statutory provisions created private rights of action on their face and declined to read a private right of action into the sections.

As a preliminary note, §§ 38.2-2203, 38.2-4221 and 38.2-4312 do not apply to Trigon's business, so American Chiropractic cannot state a claim under those code sections. Section 38.2-2203 deals with "bodily injury liability insurance"; § 38.2-4221 applies to non-stock corporations; and § 38.2-4312(E) applies to health maintenance organizations. Trigon is a for-profit stock corporation that operates in the field of accident and sickness insurance. Thus, by their clear terms, these statutory provisions do not apply to Trigon's business decisions.

The issue is thus, whether § 38.2-3408, which applies to accident and sickness insurance companies, creates a private cause of action. For the following reasons, we hold that Virginia would not recognize a private cause of action under this code section. The section reads, in relevant part, "[i]f an accident and sickness insurance policy provides reimbursement for any service that may be legally performed by a person licensed in this Commonwealth as a chiropractor . . . reimbursement under the policy shall not be denied because the service is rendered by the licensed practitioner." Va. Code Ann. § 38.2-3408. The code section itself does not include an enforcement mechanism, but § 38.2-200 explains that the "[State Corporation] Commission is charged with the execution of all laws relating to insurance and insurers." Va. Code Ann. § 38.2-200. Section 38.2-221 grants the Commission the power to levy and enforce penalties against insurers for violations of the insurance code. Va. Code Ann. § 38.2-221. That section, however, also states that the "power and authority conferred upon the Commission by this section shall be in addition to and not in substitution for the power and authority conferred upon the courts by general law to impose civil penalties for violations of the laws of this Commonwealth." Va. Code Ann. § 38.2-221.

We have previously stated that "federal courts should be reluctant to read private rights of action into state laws where state courts and state legislatures have not done so. Without clear and specific evi-

dence of legislative intent, the creation of a private right of action by a federal court abrogates both the prerogatives of the political branches and the obvious authority of states to sculpt the content of state law." *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669, 674 (4th Cir. 1986). Applying this test, we held that the Virginia Unfair Trade Practices Act (UTPA) did not create a private cause of action because it lacked explicit language creating such an action. The Virginia UTPA contained a statutory provision similar to § 38.2-221,[19] and we explained that it "[did] not create any new rights of action but instead preserve[d] any existing right of action that an injured person may have against a wrongdoer." *Id.* at 674 n.5. We have found no Virginia cases since *A & E Supply* that call this understanding into question.

Like the Virginia UTPA, § 38.2-3408 does not create a private right of action because it does not contain any specific statutory language creating such an action. The existence of § 38.2-221 does not evince a legislative intent to create private rights of action under the insurance code. Rather, as we explained in *A & E Supply*, that statutory provision only leaves in place pre-existing statutory and common-law rights of action.

Accordingly, the district court was correct in dismissing American Chiropractic's claim under the Virginia insurance equality laws.

V.

Count Three

(RICO)

American Chiropractic's final contention of error relating to the substantive holdings of the district court is that the district court erred

---

[19]The provision at issue in *A & E Supply* read that "no order of the Commission under this article shall in any way relieve or absolve any person affected by such order from any liability under any other laws of this Commonwealth." *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.,* 798 F.2d 669, 674 n.5 (4th Cir. 1986) (quoting Va. Code Ann. § 38.1-57.1)).

in finding that its RICO claim was preempted by the McCarran-Ferguson Act and dismissing that claim pursuant to Rule 12(b)(6).[20] As stated above, we review de novo a complaint for failure to state a claim and "take all allegations as admitted and examine whether the plaintiff can prove any set of facts that would entitle him to relief." *Anderson v. Found. for Advancement, Educ. and Employment of Am. Indians*, 155 F.3d 500, 505 (4th Cir. 1998). "Federal 'notice' pleading standards require that the complaint be read liberally in favor of the plaintiff." *Id.* For the reasons that follow, we agree that American Chiropractic's claim is not preempted by the McCarran-Ferguson Act, but nonetheless affirm the district court's dismissal of this count because American Chiropractic failed to allege a claim for mail fraud or wire fraud and, accordingly, failed to state a claim for a RICO violation.

## A.

The McCarran-Ferguson Act provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C.A. § 1012(b) (West 1997). The McCarran-Ferguson Act does not apply to federal laws that are specifically targeted at the business of insurance. *Id.* Trigon argues that applying RICO to American Chiropractic's claims would invalidate, impair or supersede Virginia's insurance code, found at Title 38.2 of the Code of Virginia. For a federal law to be preempted by McCarran-Ferguson: (1) the state law in question must be enacted for the purpose of regulating the business of insurance; (2) the federal law must not be specifically related to the business of insurance; and (3) the federal law must invalidate, impair or supersede the state law in question. *Humana, Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). The second factor is easily satisfied because the Supreme Court has held that "RICO is not a law that specifically relates to the business of insurance." *Humana*, 525 U.S. at 307 (quotation marks omitted). Thus, we are left to decide whether Title 38.2 is a law enacted for the purpose of regulating the

---

[20]As discussed *infra*, in its RICO claim, American Chiropractic alleged that Trigon engaged in a pattern of racketeering activity including mail fraud, wire fraud, and extortion.

business of insurance and, if so, whether RICO impairs, invalidates or supersedes its operation.

We have little difficulty concluding that Title 38.2 is a set of laws enacted for the purpose of regulating the business of insurance. The Supreme Court has stated that "[s]tatutes aimed at protecting or regulating this relationship [between insurer and insured], directly or indirectly are laws regulating the 'business of insurance.'" *SEC v. Nat'l Securities, Inc.*, 393 U.S. 453, 460 (1969). "[T]he focus of McCarran-Ferguson is upon the relationship between the insurance company and its policyholders . . . ." *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 501 (1993). Accordingly, the McCarran-Ferguson Act encompasses "laws that possess the 'end, intention, or aim' of adjusting, managing, or controlling the business of insurance." *Id.* at 505. Applying these standards, Title 38.2 of the Code of Virginia, specifically §§ 38.2-200, 38.2-221 and 38.2-3408 at issue here, is a set of laws enacted for the purpose of regulating the business of insurance. Title 38.2 is limited to insurance companies and creates a comprehensive network of statutory provisions aimed at controlling and managing the business of insurance. For instance, § 38.2-3408, by requiring insurers to provide reimbursement for all providers of covered services, helps to manage the relationship between the policyholder and the insurance company by ensuring that if a particular service is covered by an insurance company, the policyholder can seek treatment from any provider able to perform that service.

Accordingly, we next must decide whether allowing a RICO claim to proceed against an insurance company would "invalidate, impair, or supersede" Virginia's insurance code. The Supreme Court recently considered a similar question: whether RICO invalidated, impaired or superseded Nevada's laws regulating insurance. *Humana*, 525 U.S. at 307. In *Humana*, the Court defined "invalidate" as "to render ineffective, generally without providing a replacement rule or law," and "supersede" as "to displace (and thus render ineffective) while providing a substitute rule." *Id.* Using these definitions, it is clear that, as in *Humana*, RICO's application would neither "invalidate" nor "supersede" Virginia law.[21]

---

[21]The district court relied heavily on *Ambrose v. Blue Cross & Blue Shield of Va., Inc.*, 891 F. Supp. 1153 (E.D. Va. 1995), *aff'd* 95 F.3d 41

Thus, the key question, as in *Humana*, is whether RICO's application to Trigon's alleged conduct would "impair" Virginia's law. In holding that RICO did not impair Nevada's law, the Supreme Court stated that

> When federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application.

*Id.* at 310. The only difference between the Nevada laws considered in *Humana* and the Virginia laws at issue in this case is that the Nevada laws explicitly provided for a private right of action, whereas the Virginia laws, as discussed *supra*, Part IV, do not. The district court found this difference dispositive, holding that application of RICO would convert Virginia's system of public redress into a federal system of private redress and thus that RICO would impair, invalidate, and supersede Virginia law. *Am. Chiropractic Ass'n*, 258 F. Supp. 2d at 735. We disagree.

Instead, we agree with the Tenth Circuit's resolution of this issue in *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089 (10th Cir. 1999). The Missouri insurance laws at issue in that case, like the Virginia insurance laws at issue here, did not provide for a private right of action. The court nonetheless concluded that *Humana* compelled a holding that the RICO claims were not barred by the McCarran-Ferguson Act. *Id.* at 1099. The court held

> RICO "advances" Missouri's "interest in combating insurance fraud" and "does not frustrate any articulated [Missouri] policy." Although Missouri does not provide a private cause of action under its [insurance laws], it does allow causes of action under other state law. *See* Mo. Rev. Stat.

---

(4th Cir. 1996) (unpublished per curiam opinion). Because *Ambrose* was decided before the Supreme Court's decision in *Humana, Inc. v. Forsyth*, 525 U.S. 299 (1999), and because the district court in *Ambrose* applied different definitions for the statutory terms than did the *Humana* Court, that decision is not helpful to our decision today.

§ 375.944(4) (1991). Therefore, the McCarran-Ferguson Act does not bar [the] RICO claims.

*Id.* (quoting *Humana*, 525 U.S. at 314); *see also Humana*, 525 U.S. at 312 ("Moreover, the [Nevada] Act is not hermetically sealed; it does not exclude application of other state laws, statutory or decisional."); *Sabo v. Metropolitan Life Ins. Co.*, 137 F.3d 185 (3d Cir. 1998) (holding that RICO does not impair a state insurance law that permits private rights of action under other state laws). *But see LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640 (8th Cir. 1999) (holding that the lack of a private right of action in the state insurance laws was dispositive without considering whether the statute at issue permitted the application of other state laws to the conduct of insurers).

RICO furthers Virginia's interest in policing insurance fraud and misconduct and does not frustrate any declared state policy. Although RICO's damage provisions are admittedly more severe than many state laws, RICO does not interfere with Virginia's administrative scheme. Moreover, as discussed in Part IV, although Virginia's insurance laws do not create private rights of action, § 38.2-221 allows for other state laws to apply to the conduct of insurers.[22] Va. Code Ann. § 38.2-221 (The "power and authority conferred upon the Commission by this section shall be in addition to and not in substitution for the power and authority conferred upon the courts by general law to impose civil penalties for violations of the laws of this Commonwealth."). We agree with the Tenth Circuit that in such a situation, *Humana* compels a conclusion that American Chiropractic's RICO claim was not barred by the McCarran-Ferguson Act.

B.

Although we disagree with the reasoning of the district court, we can affirm the dismissal of the complaint "on any basis fairly supported by the record." *Eisenberg v. Wachovia Bank, N.H.*, 301 F.3d 220, 222 (4th Cir. 2002). Perhaps anticipating our conclusion in Part

---

[22]For example, in this case American Chiropractic asserted state law claims for tortious interference with a business relationship, common law and statutory conspiracy, and breach of contract.

V.A., Trigon has argued in the alternative that we should affirm the 12(b)(6) dismissal of the RICO claim because American Chiropractic has failed to state a claim under RICO. RICO provides, in pertinent part, that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income . . . [in] the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C.A. § 1962(a). "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue . . . and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C.A. § 1964(c).

A plaintiff bringing a civil RICO action under § 1964(c) must adequately plead at least two predicate acts of racketeering that form a "pattern of racketeering." 18 U.S.C.A. § 1961(5). Private civil RICO suits may be brought regardless of whether the government chooses to prosecute the criminal RICO violation. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 493 (1985). Here, American Chiropractic's complaint stated that Trigon committed mail fraud, wire fraud, and extortion.[23] All three qualify as "racketeering activity," *see* 18 U.S.C.A. § 1961(1), but Trigon contends that American Chiropractic cannot state a claim for any of those predicate acts.

We consider first the alleged mail and wire fraud. The federal mail and wire fraud statutes prohibit the use of the mails or interstate wires in furtherance of schemes to defraud. 18 U.S.C.A. §§ 1341, 1343 (West 2000). For the government to obtain a conviction for mail or wire fraud it must prove (1) a scheme disclosing an intent to defraud; and (2) the use, respectively, of the mails or interstate wires in furtherance of the scheme. *See Chisolm v. Transouth Fin. Corp.*, 95 F.3d 331, 336 (4th Cir. 1996). In a prosecution for mail or wire fraud, the government is not required to show reliance on any misrepresentation.

---

[23]American Chiropractic also alleged the predicate act of securities fraud in its complaint, but it did not pursue that claim because Trigon previously had not been convicted of securities fraud, as required by 18 U.S.C.A. § 1964(c) (West 2000).

To recover civil RICO damages, however, an individual must also allege that he was injured "by reason of" the pattern of racketeering activity. *Id.*; *see also* 18 U.S.C.A. § 1964(c). To meet this burden with respect to mail fraud and wire fraud, a plaintiff must "*plausibly* allege both that [he] detrimentally relied in some way on the fraudulent mailing [or wire] . . . and that the mailing [or wire] was a proximate cause of the alleged injury to [his] business or property." *Chisolm*, 95 F.3d at 337 (emphasis added). The alleged fraud "must be a 'classic' one[,] . . . the plaintiff must have justifiably relied, to his detriment, on the defendant's material misrepresentation." *Id.* American Chiropractic's complaint states that Trigon committed mail and wire fraud by representing, in its "Ancillary Professional Provider Agreement," that it reimburses healthcare providers pursuant to the Federal Resource Based Relative Value Scale (RBRVS).[24] The complaint stated that chiropractors justifiably relied upon this alleged misrepresentation in deciding to enter into provider agreements with Trigon and that the chiropractors were injured because Trigon does not, in fact, reimburse chiropractic services pursuant to the RBRVS.[25] Trigon entered the Ancillary Professional Provider Agreement in full to support its motion to dismiss.

Although as a general rule extrinsic evidence should not be considered at the 12(b)(6) stage, we have held that when a defendant attaches a document to its motion to dismiss, "a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *see also Parrino v. FHP, Inc.*, 146 F.3d 699, 705-06 (9th Cir.1998). As the Third Circuit has explained

---

[24]The RBRVS is the relative value scale used by Medicare in setting its reimbursement rates for providers under that program.

[25]At oral argument before this court, counsel for American Chiropractic also alleged that Trigon committed mail fraud by telling its plan enrollees that healthcare providers were reimbursed in accordance with Medicare rates. The district court previously had held that American Chiropractic lacked standing to advance the claims of individual patients, and American Chiropractic did not appeal that ruling. Thus, the argument that Trigon committed mail fraud against its enrollees is not properly before this court.

The rationale underlying this exception is that the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quotation marks omitted).

As stated above, American Chiropractic explicitly referred to the Ancillary Professional Provider Agreement, and its mail and wire fraud claims are based on the alleged misrepresentation made in that document. In addition, American Chiropractic does not contest the authenticity of the documents. Accordingly, we can consider those documents at the 12(b)(6) stage of the litigation.

The Ancillary Professional Provider Agreement states, in part, that "[m]ost Trigon fees are based upon external benchmarks of relative value, for example, the [RBRVS]." (J.A. at 156.) Thus, American Chiropractic alleges, Trigon has misled chiropractors into believing that their reimbursement would be based upon Medicare's reimbursement system. In full, however, the Ancillary Professional Provider Agreement states that

> *Trigon's fee schedules represent the maximum Allowable Charge for each covered service that corresponds to a single service code*. The preponderance of valid service codes [are] from Current Procedural Terminology (CPT), HCFA Common Procedural Coding System (HCPCS), American Dental Association (ADA), or National Drug Codes (NDC). For *covered services represented by a single code, the maximum Allowable Charge is the fee schedule amount determined by Trigon in its sole discretion* or your usual charge for the service, whichever is less. *Most Trigon fees are*

> *based upon external benchmarks* or relative value, for
> example, the Federal Resource Based Relative Value Scale
> (RBRVS), Average Wholesale Price (AWP), American
> Society of Anesthesiologists (ASA), relative value and Med-
> icare's laboratory and Durable Medical Equipment (DME)
> fees.

(J.A. at 156 (footnote omitted) (emphases added).)

The Agreement comes with Trigon's fee schedule attached. Rele-
vant here, Trigon's fee schedule includes the maximum allowable
charge for the four service codes associated with spinal manipula-
tions. The fee schedule discloses that Trigon reimburses providers
who perform spinal manipulations the same amount regardless of how
many "regions" of the spine are manipulated. The RBRVS, however,
provides a higher reimbursement when more spinal regions are
manipulated. It is undisputed that Trigon began this reimbursement
practice in 1997.

We conclude that American Chiropractic, as a matter of law, could
not justifiably rely on the statement that "most" Trigon fees are based
on the RBRVS for two reasons. First, the statement only provides that
"*most*" fees are based on the external benchmark of the RBRVS. The
term "most" indicates that some of Trigon's reimbursement payments
were not based upon the RBRVS. Second, the remainder of the docu-
ment clearly explains that Trigon's fee schedule represents the maxi-
mum allowable charge for a service. Moreover, the fee schedule
discloses that Trigon does not follow the RBRVS when reimbursing
for spinal manipulations. Because the fee schedule discloses that Tri-
gon does not reimburse for spinal manipulation services according to
the RBRVS, American Chiropractic could not have justifiably relied
on Trigon's alleged misrepresentation that most of Trigon's fees were
based on the RBRVS. Accordingly, American Chiropractic has failed
to plausibly allege that it justifiably relied on a misrepresentation by
Trigon.

To withstand a motion to dismiss for failure to state a RICO claim,
a plaintiff must plausibly allege at least two predicate acts of racke-
teering. As noted above, American Chiropractic's complaint alleged
three predicate acts — mail fraud, wire fraud, and extortion. Because

we have held that American Chiropractic failed to state a claim for mail or wire fraud, it has failed to allege at least two predicate acts of racketeering, and we need not address whether it properly alleged a claim of extortion.

Although, in light of *Humana, Inc v. Forsyth*, American Chiropractic's claim is not preempted by the McCarran-Ferguson Act, we affirm the dismissal of this count because American Chiropractic failed to state a claim for a RICO violation.

## VI.

Finally, American Chiropractic argues that the district court abused its discretion in handling discovery in this case by refusing to extend the temporal scope of discovery to include events prior to 1996 and by failing to lengthen discovery after Trigon turned over documents relating to the MCAP in a tardy manner.[26] "We afford substantial discretion to a district court in managing discovery and review discovery rulings only for abuse of that discretion." *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 290 (4th Cir. 2002), *cert. denied*, 123 S. Ct. 1929 (2003).

Discovery commenced in September 2001, soon after the district court addressed Trigon's motion to dismiss, and the parties agreed in writing to limit discovery requests to events occurring after January 1, 1996.[27] Discovery lasted ten months, concluding on June 28, 2002.

---

[26]American Chiropractic raises four other arguments relating to the conduct of discovery. Those arguments are that the district court abused its discretion by: (1) failing to require Trigon to produce the identity of all medical doctors employed by Trigon; (2) refusing to compel Trigon to turn over information regarding any service code that paid a lower reimbursement amount to limited-license practitioners than to medical doctors; (3) by refusing to compel Trigon to turn over more of Dr. Colley's file; and (4) by refusing to allow American Chiropractic to conduct another Rule 30(b)(6) deposition. We have examined these issues carefully and conclude that they are without merit; thus, we affirm those rulings as well.

[27]The parties agreed that this time limit could be revised by negotiations in good faith if American Chiropractic could show a valid basis for requesting additional information.

On June 14, 2002, just prior to the close of discovery, Trigon turned over documents relating to Dr. Colley and his involvement with the MCAP. Trigon admitted that despite its efforts to locate the documents, they had been "overlooked" and offered to cure the late production by allowing American Chiropractic to depose Dr. Colley after the stated discovery deadline passed. Trigon also permitted American Chiropractic to depose two representatives of medical societies with members on the MCAP after the close of discovery.

American Chiropractic's first assertion is that the district court abused its discretion by limiting the scope of discoverable materials to those created after January 1, 1996. By doing so, American Chiropractic contends, the district court rendered American Chiropractic unable to pursue key avenues of investigation in the case, including the $500 coverage cap instituted in 1988 and the MCAP meeting from October of 1995 where the Low Back Guideline was approved. Unfortunately for American Chiropractic, this limitation was imposed not by judicial fiat, but by the mutual agreement of the parties. The record shows that American Chiropractic and Trigon agreed, in writing, to limit discovery to events arising after January 1, 1996 unless, in good faith, a more expansive time period was necessary. American Chiropractic failed to contact Trigon to discuss expanding the time period and did not mention the limiting nature of the agreement to the district court until June 18, 2002, a mere ten days before the close of discovery. The district court found that expanding the time period to events before January 1, 1996, would be "overly burdensome" to Trigon and refused American Chiropractic's invitation to do so. (J.A. at 1137.) We cannot say the district court abused its discretion by refusing, at such a late date, to expand the scope of discovery beyond that mutually agreed to by the parties.

Next, American Chiropractic contends that the district court abused its discretion by refusing to extend the end-date of discovery when Trigon turned over documents relating to the Low Back Guideline and the MCAP's October 25, 1995 meeting just before the close of discovery. Trigon does not dispute that it was dilatory in turning over those particular documents; in a letter to American Chiropractic, it admitted that "despite Trigon's good faith efforts to produce all of the relevant documents, these documents were not found and were overlooked during the previous document productions. This was admit-

tedly a mistake by Trigon." (J.A. at 5296.) Despite this admitted mistake, the district court denied American Chiropractic's request for more discovery and found that "any mistakes on Trigon's part have not caused prejudice." (J.A. at 1131.)

While we are not sure that Trigon's late production of these documents did not have the potential to cause prejudice, two factors lead us to conclude that the district court did not abuse its discretion in refusing to extend discovery. First, Trigon offered to cure the late production by allowing American Chiropractic to conduct an additional deposition of Dr. Colley after the close of discovery. Second, Trigon allowed American Chiropractic to take depositions of two of the medical societies with members on the MCAP after the close of discovery as well.

Additionally, if American Chiropractic felt that it had insufficient time to conduct discovery given the late production of documents, and/or that Trigon was not negotiating in good faith an agreement for further discovery, it could have filed a Rule 56(f) motion in response to Trigon's motion for summary judgment.[28] We have held that "[i]f a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56(f) affidavit." *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002). This American Chiropractic did not do. In sum, we find that the district court did not abuse its discretion in its discovery rulings.

## VII.

In conclusion, we affirm the district court's grant of summary judgment on American Chiropractic's § 1 Sherman Act claim, Virginia civil and common law conspiracy claims, and tortious interference claim. We also affirm the district court's dismissal of American Chiropractic's claim under the Virginia insurance equality laws for fail-

---

[28]Federal Rule of Civil Procedure 56(f) provides that "[s]hould it appear from the affidavits of a party opposing [a summary judgment] motion that the party cannot for reasons stated present by affidavits facts essential to justify the party's opposition, the court may . . . order a continuance to permit . . . discovery to be had."

ure to state a claim. Although we disagree with the district court's holding that American Chiropractic's RICO claim is preempted by the McCarran-Ferguson Act, we affirm the district court's dismissal of that claim because American Chiropractic has failed to state a claim for a RICO violation. We also find that the district court's discovery rulings were not an abuse of discretion.

*AFFIRMED*