**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMES BROOKS; DONALD HAMLETTE;
SAMUEL ST. JOHN,

       *Plaintiffs-Appellants,*

v.

HOWARD R. ARTHUR, SR., In his
individual capacity; RANDAL
MITCHELL,

       *Defendants-Appellees.*

No. 09-1551

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(6:08-cv-00028-nkm-mfu)

Argued: September 21, 2010

Decided: November 19, 2010

Before NIEMEYER and KING, Circuit Judges, and
Robert J. CONRAD, Jr., Chief United States District Judge
for the Western District of North Carolina,
sitting by designation.

Vacated and remanded by published opinion. Judge King
wrote the opinion, in which Judge Niemeyer and Judge
Conrad joined.

## COUNSEL

Richard F. Hawkins, III, HAWKINS LAW FIRM, Richmond,
Virginia, for Appellants. Sydney Edmund Rab, OFFICE OF
THE ATTORNEY GENERAL OF VIRGINIA, Richmond,
Virginia, for Appellees.

## OPINION

KING, Circuit Judge:

In 2008, plaintiffs James Brooks, Donald Hamlette, and
Samuel St. John, who were correctional officers for Virginia's
Department of Corrections (the "Department"), initiated these
since-consolidated civil actions in the Western District of Vir-
ginia, asserting retaliation claims under 42 U.S.C. § 1983.
Their respective complaints named as defendants Howard R.
Arthur, Sr., and Randal W. Mitchell — the plaintiffs' supervi-
sors — in their individual capacities. The defendants sought
dismissal of the complaints, asserting primarily that the doc-
trine of res judicata barred the plaintiffs' § 1983 claims
because the allegations made therein had been resolved
administratively. The district court, deeming the Department
and the defendants to have been in privity in the relevant
administrative proceedings, ruled that the doctrine of res judi-
cata mandated dismissal of the § 1983 claims. *See Brooks v.
Arthur*, 611 F. Supp. 2d 592 (W.D. Va. 2009) (the "Opin-
ion"). As explained below, because there was no privity
between the Department and the defendants in their individual
capacities, we vacate and remand.[1]

---

[1]Significantly, on March 5, 2009, the defendants filed a notice of "Sug-
gestion of Death," advising the district court that plaintiff St. John died on
February 6, 2009. Under Federal Rule of Civil Procedure 25(a)(1), St.
John's successor or representative had ninety days from service of the
notice to file a motion for substitution. No such motion was made before
the court issued its Opinion of April 14, 2009, dismissing the plaintiffs'
claims. In these circumstances, the court should consider on remand
whether to dismiss St. John's complaint under Rule 25(a)(1).

## I.

## A.

The three plaintiffs were employed as correctional officers at the Rustburg Correctional Unit #9 in Rustburg, Virginia (the "Unit").[2] At the Unit, plaintiffs Brooks and St. John, both of whom were Senior Corrections Officers, were under the direct supervision of plaintiff Hamlette, a Lieutenant. Hamlette, in turn, was supervised by defendants Arthur, the Superintendant of the Unit, and Mitchell, a Major and Arthur's second-in-command. In April 2006, Hamlette visited the equal employment opportunity ("EEO") office of the Department and lodged a complaint, alleging that both Arthur and Mitchell had discriminated against him on the basis of race and religion. Brooks and St. John were identified as witnesses who would support Hamlette.

Arthur became aware of Hamlette's EEO complaint in May 2006. The plaintiffs allege that Arthur immediately upbraided Hamlette for violating the chain of command by going to the EEO office instead of coming directly to Arthur. In July 2006, the EEO office requested written responses from Arthur and Mitchell with respect to Hamlette's complaint. The EEO office also sent letters to the witnesses identified in the complaint. Although the witness letters were marked "confidential," they were placed in open Unit mailboxes where they could be viewed by others. Notably, Arthur's and Mitchell's responses were to be filed by August 31, 2006.

Before any responses were filed, however, on August 30, 2006, Arthur issued three so-called Group III notices, one

---

[2]Because the district court resolved this dispute pursuant to Federal Rule of Civil Procedure 12(b)(6), we must accept the facts alleged in the complaints as true and view "them in the light most favorable to the plaintiff[s]." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 228-29 (4th Cir. 2004). This factual recitation is set forth in that light.

each to Brooks, Hamlette, and St. John, terminating their employment with the Department.[3] Brooks and Hamlette were discharged effective September 1, 2006, and St. John was terminated effective September 5, 2006. The Group III notices to Brooks and St. John alleged that they each failed to conduct inmate counts and had falsified inmate count sheets. The Group III notice against Hamlette accused him of failing to properly supervise Brooks and St. John and of failing to follow a supervisor's instructions.

B.

In September 2006, in response to what they deemed unfounded Group III notices and pretextual terminations, the plaintiffs each filed grievances with the Department of Employment Dispute Resolution ("EDR"). The EDR grievances alleged that issuance of the Group III notices against the plaintiffs was inconsistent, unfair, and harsh in light of how other behavior by correctional officers had been theretofore dealt with at the Unit, and that the notices were filed in retaliation for Hamlette asserting the EEO complaint and because Brooks and St. John were willing to testify favorably on Hamlette's behalf.[4]

The administrative hearings on the EDR grievances were

---

[3]Pursuant to regulations of the Department, unacceptable behavior of correctional officers is divided into three groups, based on the severity of such behavior. Group III behavior is the most severe and "include[s] acts of behavior of such a serious nature that a first occurrence normally should warrant removal." J.A. 84. Group II behavior "include[s] acts and behavior that are more severe in nature and are such that an accumulation of two Group II offenses normally should warrant removal." *Id.* Group I behavior is the least serious, and "include[s] types of behavior less severe in nature, but [which] require correction in the interest of maintaining a productive and well managed work force." *Id.* (Citations herein to "J.A. __" refer to the Joint Appendix filed by the parties in this appeal.)

[4]The EDR grievances of Hamlette and Brooks are included in the record, but the St. John grievance is not contained therein.

conducted before a hearing officer in January 2007. On April 2, 2007, the hearing officer rendered his decision concerning the grievance of Hamlette, setting forth his findings of fact and conclusions of law (the "Hamlette Decision"). The Hamlette Decision found that six instances of misconduct had occurred in the early morning hours of August 30, 2006.

- At 2:20 a.m., Hamlette was at a front gate post where he was unable to observe other officers as he was required to do.

- At 2:33 a.m., Brooks recorded that he had made rounds when he had not.

- At 3:05 a.m., St. John recorded that rounds were made when neither he nor Brooks had done so.

- At 4:05 a.m., St. John once again recorded that rounds were made when neither he nor Brooks had done so.

- Hamlette failed to observe inmates working in the kitchen as he had been previously ordered to do.

- At 4:45 a.m., Brooks and St. John filled out "count sheets" — which list the number of inmates in the facility and are typically completed every hour — without personally verifying the presence of each inmate.

The Hamlette Decision concluded by reducing Hamlette's Group III notice to a Group II notice, and reinstating Hamlette to his position as a correctional officer with an award of back pay. The Hamlette Decision found that Hamlette "has not presented evidence to show similarly situated employees were treated differently from how he was treated." J.A. 86. In disposing of the retaliation claim, the Hamlette Decision con-

cluded that, although Hamlette "has established that he engaged in protected activity and that he suffered a materially adverse action because of his job loss[,] [he] has not established a connection between the protected activity and the adverse action." *Id.* at 87. Hamlette did not appeal the Hamlette Decision and thereafter settled his EEO complaint.

Brooks and St. John appealed the initial EDR rulings on their grievances to the Circuit Court of Campbell County, Virginia.[5] On August 2, 2007, the state court vacated those EDR rulings and remanded for further proceedings. On October 10, 2007, the EDR hearing officer issued two reconsideration decisions — one on the Brooks grievance and another on the St. John grievance (collectively, the "Reconsideration Decisions"). The Reconsideration Decisions made essentially the same findings theretofore made in the Hamlette Decision. Additionally, the Group III notices of Brooks and St. John were reduced to Group II notices with awards of back pay. The Reconsideration Decisions also rejected the Brooks and St. John allegations of having been treated differently from similarly situated employees and terminated in retaliation for their support of Hamlette's EEO complaint. No further administrative processes were pursued by either the plaintiffs or the Department.

## C.

### 1.

In September 2008, the plaintiffs filed their separate complaints in the district court — thereafter consolidated and amended — seeking declaratory relief and damages against defendants Arthur and Mitchell in their individual capacities. The operative complaints recount Hamlette's filing of the EEO complaint and the issuance of the Group III notices of

---

[5]The initial EDR rulings relating to the Brooks and St. John grievances are not found in the record.

August 30, 2006, the day before the defendants' EEO responses were due. The complaints allege that the Group III notices were issued in retaliation for Hamlette's filing of his EEO complaint and because Brooks and St. John were willing to support him. Additionally, the complaints allege that the defendants interfered with the grievance process itself, asserting that Arthur and Mitchell advised witnesses that their participation in the hearing was voluntary and threatened such witnesses with retaliation if they testified favorably to the plaintiffs.

The complaints specify two § 1983 retaliation claims, plus a state law claim. First, Count I (a § 1983 claim) alleges that Arthur initiated the Group III notices against the plaintiffs in response to the EEO complaint. Second, Count II (another § 1983 claim) alleges that Arthur and Mitchell interfered with the grievance process (i.e., by witness intimidation). Finally, Count III (a state law claim) asserts that Arthur tortiously interfered with the plaintiffs' employment contracts with the Department. In March 2009, the defendants moved the district court, pursuant to Rule 12(b)(6), to dismiss the complaints, contending, inter alia, that Counts I and II were barred by the doctrines of collateral estoppel and res judicata. The thrust of their Rule 12(b)(6) endeavor was that defendants Arthur and Mitchell were in privity with the Department in the grievance proceedings and that the Hamlette Decision and the Reconsideration Decisions barred the § 1983 claims under the doctrine of res judicata. The plaintiffs responded that the rule of differing capacities — that defendants are not in privity with themselves in their official and individual capacities — applied, and that there was a lack of privity between the Department, on the one hand, and the defendants individually, on the other. The plaintiffs relied primarily on our decision in *Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000) (hereinafter "*Daw II*"), asserting that it constituted controlling precedent on the res judicata issue.

## 2.

By its Opinion of April 14, 2009, the district court granted the defendants' motion to dismiss, ruling that the § 1983 claims were barred by res judicata. *See Brooks v. Arthur*, 611 F. Supp. 2d 592 (W.D. Va. 2009).[6] First and foremost, the court rejected the plaintiffs' reliance on *Daw II* and was instead persuaded by our unpublished decision in *Davani v. Clement*, 263 F. App'x 296 (4th Cir. 2008) (hereinafter *"Davani II"*). Predicated on the court's conclusion that *Daw II* was distinguishable and that *Davani II*'s reasoning more aptly applied, the court ruled that the Department and the defendants were in privity during the EDR grievance proceedings. As part of its analysis, the court looked to see if the Department's and the defendants' interests in the EDR hearings and the § 1983 suit were identical. *See Brooks*, 611 F. Supp. 2d at 599 (recognizing that under Virginia law, "'[t]he touchstone of privity for purposes of res judicata is that a party's interest is so identical with another that representation by one party is representation of the other's legal right'" (quoting *State Water Control Bd. v. Smithfield Foods, Inc.*, 542 S.E.2d 766, 769 (Va. 2001))). The court concluded that, "[a]lthough the Plaintiffs' grievance proceedings were brought against the Department of Corrections, the interests of the Department, Arthur, and Mitchell in the grievance pro-

---

[6]In rendering its Opinion, the district court took judicial notice of the plaintiffs' EDR grievances, the Hamlette Decision, the orders of the Circuit Court of Campbell County vacating the initial EDR rulings on the Brooks and St. John grievances, the EDR hearing officer's Reconsideration Decisions, the EDR Grievance Procedure Manual, the EDR Rules for Conducting Grievance Hearings, and the settlement agreement regarding Hamlette's EEO complaint — none of which had been filed with or incorporated into the complaints. The court explained that "'[f]acts subject to judicial notice may be considered by a court on a motion to dismiss. When entertaining a motion to dismiss on the ground of res judicata or collateral estoppel, a court may judicially notice facts from a prior judicial proceeding.'" *Brooks*, 611 F. Supp. 2d at 597 (quoting *Briggs v. Newberry Cnty. Sch. Dist.*, 838 F. Supp. 232, 234 (D.S.C. 1992)).

ceedings and this action are effectively the same." *Id.* at 599. The court further explained that

> [e]ach has or had a strong interest in the efficient and effective operation of the Rustburg Unit, and in the legitimacy and finality of disciplinary and management decisions. All of the allegations lodged against the Defendants also arose out of their actions as supervisors employed by the Commonwealth, which may only act through its employees or its agencies. Furthermore, the Department's interest in defending against Plaintiffs' grievances was identical to the individual Defendants' interest in this action: proving, by a preponderance of the evidence, that the discipline issued was warranted and not a result of the Plaintiffs engaging in protected civil rights activity.

*Id.* (citation omitted).[7] The court thus dismissed the two § 1983 claims (Counts I and II) as barred by res judicata. The court then dismissed the state law tortious interference claim (Count III) by declining to exercise supplemental jurisdiction. Timely notices of appeal have been filed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

We review de novo a district court's dismissal of a complaint on the basis of res judicata. *See Q Intern Courier Inc. v. Smoak*, 441 F.3d 214, 216 (4th Cir. 2006). In assessing a Rule 12(b)(6) ruling, we accept the factual allegations of the complaint as true. *See U.S. Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317 (4th Cir. 2010). Additionally, however, we may consider facts on which the district court properly took judicial notice. *See Daw II*, 201 F.3d at 524 n.1.

---

[7]The district court also analyzed whether the issues in the EDR proceedings and the § 1983 action were identical, and concluded that they were. *See Brooks*, 611 F. Supp. 2d at 601.

("[W]hen entertaining a motion to dismiss on the ground of res judicata, a court may take judicial notice of facts from a prior judicial proceeding when the res judicata defense raises no disputed issue of fact.").

III.

A.

In resolving this appeal, we first recognize that the EDR grievance decisions may be accorded the same force as a state court judgment because the parties were given an "adequate opportunity to litigate." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) (explaining that "when a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's fact finding the same preclusive effect to which it would be entitled in the State's courts" (internal quotation marks omitted)). Second, because we are considering whether to give preclusive effect to state administrative decisions, we must adhere to Virginia's legal principles concerning res judicata. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) ("The Full Faith and Credit Act, 28 U.S.C. § 1738, . . . requires [a] federal court to give the same preclusive effect to a state-court judgment as another court of that State would give." (internal quotation marks omitted)).

The governing authority on privity and res judicata issues in Virginia is set forth in *State Water Control Board v. Smithfield Foods, Inc.*, where the Supreme Court of Virginia recognized that, "[t]o establish the defense of res judicata, the proponent of the doctrine must establish identity of the remedies sought, identity of the parties, and identity of the quality of the persons for or against whom the claim is made." *See* 542 S.E.2d 766, 769 (Va. 2001) (citation omitted). That decision also recognized that privity should be determined on a case by case basis. *Id.* Of significance, the Supreme Court of

Virginia has emphasized that the federal and state tests governing privity issues are "virtually identical," specifically invoking our *Daw II* decision. *Id.* at 769 n.4.[8]

The conclusion that Arthur and Mitchell in their individual capacities were in privity with the Department in the EDR proceedings would mean that the doctrine of res judicata bars relitigation of any claims disposed of therein. Coming to such a conclusion, however, requires a transitive theory of capacities. First, it must be concluded that the Department was in privity with Arthur and Mitchell in their official capacities. Second, it must be concluded that Arthur and Mitchell in their official capacities were also in privity with themselves in their individual capacities. And, based on these two conclusions, the Department must then be deemed to have been in privity with Arthur and Mitchell in their individual capacities. If these three steps can appropriately be taken, the application of res judicata would be proper and the district court should be affirmed.

By contrast, if the Department was not in privity with Arthur and Mitchell in their individual capacities, the § 1983 claims should not have been dismissed. In this regard, we assume that the Department was in privity with the defendants in their official capacities, leaving the question of whether the defendants in their official capacities were in privity with themselves in their individual capacities. Thus, this appeal turns on the proper application of the rule of differing capacities. The theory behind that rule rests on a legal fiction about individuals having two separate identities: one identity (or capacity) as an official representative of either the government or a corporation; and a separate identity (or capacity) as an individually autonomous human being. The rule of differing capacities is generally understood to mean that defendants

---

[8]Pursuant to the foregoing, in resolving this appeal we deem the *Daw II* legal principles to be identical to those that would be applicable in the Virginia courts.

in their official and individual capacities are not in privity with one another for the purposes of res judicata. *See* Restatement (Second) of Judgments, § 36(2) (1982) ("A party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity.").

### B.

Our controlling precedent concerning the rule of differing capacities — which we see as consistent with Virginia law — is found in *Daw II*. The first *Daw* appeal (presented to us in 1997, three years prior to *Daw II*) involved a § 1983 suit against, inter alia, North Carolina Highway Patrolman J.M. Daw in his official capacity for allegedly violating a driver's constitutional rights during a traffic stop. *See Andrews v. Daw*, No. 96-7664, 1997 WL 375096, at *1 (4th Cir. July 7, 1997) (unpublished decision) (hereinafter "*Daw I*"). The district court had dismissed the *Daw I* action in its entirety, awarding summary judgment to Patrolman Daw on the basis of qualified immunity. *Id.* On appeal, however, we concluded in *Daw I* that the appropriate disposition as to Patrolman Daw in the district court was not summary judgment, but rather dismissal under Rule 12(b)(6). *Id.* In so ruling we reasoned that, because Daw had been sued in his official capacity only, he was shielded from monetary damages by the Eleventh Amendment and, thus, entitled to Rule 12(b)(6) relief. *Id.*

Soon thereafter, in the *Daw II* proceedings, Patrolman Daw was sued again under § 1983, but this time in his individual capacity. Daw promptly moved to dismiss on the basis of res judicata, arguing that the second § 1983 complaint was barred by his dismissal in *Daw I*. *See Daw II*, 201 F.3d at 524. The district court agreed and dismissed the second complaint on res judicata grounds. *Id.* In *Daw II*, we reversed the court's res judicata disposition, explaining that the rule of differing capacities means that a government official in his official

capacity is not in privity with himself in his individual capacity. *Id.* at 526.

Our *Daw II* decision explained the rationale behind the rule of differing capacities in a manner that is highly pertinent here. More specifically, we explained that, because "the real party in interest in an official-capacity suit is the entity, a plaintiff can only recover damages from the entity itself, in contrast to a personal-capacity suit, in which a plaintiff can seek a judgment against the official's personal assets." *Daw II*, 201 F.3d at 525. As Judge Williams emphasized in that decision, "different legal theories of liability are required for the plaintiff, and different defenses are available to the defendant, in a personal-capacity action than in an official-capacity action." *Id.* Put simply, because the litigation landscape is materially different in a personal-capacity suit — as opposed to an official-capacity suit — the parties are not in privity.

Furthermore, the *Daw II* decision recognized that the district court had dismissed the *Daw I* action against Patrolman Daw on Eleventh Amendment immunity grounds and had not resolved any issues regarding Daw's personal liability under § 1983. As Judge Williams emphasized, our "disposition [of the first appeal] makes it clear that [Patrolman Daw] merely served as a representative of the government when sued [in *Daw I*] in his official capacity and did not represent 'precisely the same legal right' as he did when sued in his individual capacity." *Daw II*, 201 F.3d at 525-26. *Daw II* thus explicitly concluded that "a government employee in his official capacity is not in privity with himself in his individual capacity for the purposes of res judicata." *Id.* at 526.

## C.

Here, in granting dismissal on res judicata grounds, the district court's Opinion concluded that the *Daw II* precedent is distinguishable on the issue of privity, because "the [*Daw I*] court dismissed the plaintiff's first suit [against Patrolman

Daw] on Eleventh Amendment grounds without reaching the issue of [Daw's] personal liability under § 1983." *Brooks*, 611 F. Supp. 2d at 599. The Opinion further distinguished this matter from *Daw II* on the ground that "the Plaintiffs seek to relitigate the same claims (retaliation) that were addressed in the prior proceedings." *Id.* As such, according to the court, "the state grievance proceedings cannot be easily analogized to official capacity suits." *Id.* The Opinion, therefore, sought to have it both ways on the privity issue. When it came to concluding that *Daw II* did not apply because the EDR hearings could not be readily analogized to official-capacity suits, there was no privity. But when it came to concluding that the interests of the Department and the defendants were essentially identical, privity was deemed apparent.

Instead of applying our *Daw II* precedent concerning the rule of differing capacities, the district court was persuaded by our unpublished decision in *Davani II*.[9] *Davani II* concerned an employee who had worked for but was later terminated by Virginia's Department of Transportation. *See* 263 F. App'x at 297. Davani alleged that, in being discharged, he had been discriminated against on the basis of his race, religion, and national origin. *Id.* In August 2003, Davani first challenged his dismissal in an administrative hearing, but lost. *Id.* The following year, in November 2004, Davani initiated federal court proceedings challenging his dismissal, apparently under Title VII, naming as defendants the Department of Transportation and his direct supervisors. In addressing the preclusion issues litigated in *Davani II*, Davani argued that his federal

---

[9]Like *Daw*, the *Davani* litigation has been before us twice. In the first *Davani* proceedings, the district court had held that it did not possess jurisdiction under the *Rooker-Feldman* doctrine. *See D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). On appeal, we reversed and remanded so that the parties could supplement the record and the district court could fully consider the preclusion arguments. *See Davani v. Va. Dep't of Transp.*, 434 F.3d 712, 713-14 (4th Cir. 2006) ("*Davani I*"). In *Davani II*, we resolved the post-remand second appeal.

court action was not barred by the adverse administrative rulings because the lawsuit was predicated on different facts than those in the administrative hearing, specifically that the disciplinary notices leading to his dismissal by the Department of Transportation had not all been considered previously. *Id.* at 299.

Absent from our analysis in *Davani II*, apparently because the action was pursued under Title VII, are any assessments of the rule of differing capacities or the doctrine of privity. *See Lissau v. Southern Food Service, Inc.*, 159 F.3d 177, 180 (4th Cir. 1998) (concluding Title VII "foreclose[s] individual liability"). Because the *Davani II* decision does not impact either of those issues, it necessarily has limited applicability here, and the *Daw II* decision controls.

Our explanation of why *Daw II* controls is primarily rooted in the differences in the legal landscape when a defendant is sued in his individual — as opposed to official — capacity. The *Daw II* decision emphasized three relevant distinctions: (1) damages are recovered from the entity in an official-capacity suit, while they are recovered from an official's personal assets in an individual-capacity suit; (2) different theories of liability are implicated in official- versus individual-capacity suits; and (3) different defenses are available in official- versus individual-capacity suits. *See* 201 F.3d at 525 (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). The district court's Opinion may be correct in concluding that there is no material distinction between the theories of liability in the EDR hearings and this case. Nonetheless, Arthur's and Mitchell's personal assets were not at stake in the EDR hearings. *See* Va. Code Ann. § 2.2-3005.1(A) (designating remedies EDR hearing officer may order: "(i) reinstatement, (ii) back pay, (iii) full reinstatement of fringe benefits and seniority rights, (iv) mitigation or reduction of the agency disciplinary action, or (v) any combination of these remedies"). Furthermore, the non-availability of a qualified immunity defense in the EDR proceedings, in contrast to the

availability of such a defense here, constitutes a critical distinction between the EDR proceedings and the plaintiffs' § 1983 claims. We are thus compelled to follow our precedent in *Daw II* and conclude that there was no privity between the Department and the defendants.

## IV.

Pursuant to the foregoing, we vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

*VACATED AND REMANDED*